The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
March 21, 2019

## 2019COA42

## No. 17CA2036, *Gagne v. Gagne* — Business Organizations — Limited Liability Companies — Judicial Dissolution

A division of the court of appeals addresses several issues relating to dissolution of the parties' co-owned limited liability companies. These issues include the appropriateness of dissolution and the manner in which the dissolution is to be carried out. In addressing these issues, the division provides further guidance for applying several of the factors articulated in *Gagne v. Gagne*, 2014 COA 127, relating to whether a court should order dissolution of a limited liability company. In the end, the division concludes that the district court did not err in ordering dissolution or in ordering that it be accomplished in a particular way.

COLORADO COURT OF APPEALS                                    **2019COA42**

Court of Appeals No. 17CA2036
Larimer County District Court No. 12CV56
Honorable Devin R. Odell, Judge

Richard Gagne,

Plaintiff-Appellee,

v.

Paula Gagne,

Defendant-Appellant.

JUDGMENT AFFIRMED AND CASE
REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE J. JONES
Terry and Grove, JJ., concur

Announced March 21, 2019

Otis, Bedingfield & Peters, LLC, Jennifer Lynn Peters, Timothy R. Odil, Lia
Szasz, Greeley, Colorado, for Plaintiff-Appellee

Burg Simpson Eldredge Hersh & Jardine, P.C., David P. Hersh, Diane Vaksdal
Smith, Lisa R. Marks, D. Dean Batchelder, Nelson Boyle, Englewood, Colorado,
for Defendant-Appellant

¶ 1     Paula Gagne appeals the district court's judgment dissolving four limited liability companies in which she and one of her sons, Richard Gagne, were the only members (the LLCs). Paula[1] contends that the district court erred by dissolving the four LLCs, in determining how the dissolutions would occur, and in calculating each member's portion of the LLCs' assets. She hasn't convinced us, however, that the district court erred in any respect, and so we affirm the judgment and remand for the court to determine Richard's reasonable attorney fees incurred on appeal.

## I.     Background

¶ 2     Some of the factual background relevant to this case is set forth in the prior division's decision in *Gagne v. Gagne*, 2014 COA 127 (*Gagne I*). We repeat it only as necessary and add to it developments occurring after the prior division's remand.

¶ 3     Paula and Richard are mother and son. In the mid-2000s, they agreed to a joint business venture in which Paula would buy apartment complexes and Richard would manage them. They

---

[1] Because the main players in this intra-family dispute share the same last name, for clarity's sake we will refer to the Gagne family members by their first names.

created three LLCs in 2006 to buy and manage three such properties and created a fourth LLC in 2008 to buy and manage a fourth such property. (All of the apartment buildings are in Fort Collins.) The district court found, with ample record support, that the primary purpose of these LLCs was "to provide a joint business between [Richard] and [Paula], so that the parties would be partners in a business and so that [Richard] would have an occupation and a means to support his family." The initial LLC operating agreements provided that Paula and Richard would own each LLC fifty-fifty, but that Richard would have fifty-one percent voting rights in each.

¶ 4    It didn't take long, however, for Paula and Richard's relationship, already strained, to devolve into a more or less constant state of acrimony. Litigation ensued, with Paula claiming that Richard was using the LLCs' funds for his personal benefit. The parties settled. They entered into new operating agreements in August 2010. They remained fifty-fifty owners, but this time Paula got fifty-one percent voting rights. As now relevant, each of the identical operating agreements also provides as follows:

- Paula's contributions are money (in specified amounts), while Richard's are "in-kind." The parties acknowledged

2

that these in-kind contributions had caused appreciation of the LLCs' equity in the apartment buildings.

- The success of the venture "requires the active interest, support, cooperation, and personal attention of" both Paula and Richard.

- Paula is "Chief Executive Manager" of the LLC, with "primary responsibility for managing" the LLC.

- The Chief Executive Manager "shall perform [her] [m]anagerial duties *in good faith*, in a manner [she] *reasonably* believe[s] to be in" the LLC's best interests. (Emphasis added.)

- The Chief Executive Manager is liable to the LLC and its members for any loss resulting from her "*fraud*, gross negligence, willful misconduct, or . . . *wrongful taking*." (Emphasis added.)

- Richard's company, Home Solutions, Inc. (HSI), will manage the property for a minimum of two years, with possible extensions. Should a new property manager be desired, HSI has a right of first refusal.

- If the property is sold, Paula has "a preferred status for the distribution of net revenues from the sale" to repay her cash capital contribution and any other loans or advances. If any proceeds remain, they will be divided evenly.

- Paula has "the sole right and discretion to sell" the property, subject to certain conditions.

- Paula has "the sole right and discretion to refinance" the LLC's property, again subject to certain conditions, including that she act consistently with her status as a "fiduciary for the members."

¶ 5 Unfortunately, the hatchet didn't stay buried for long. There were arguments and allegations, confrontations and criticisms — a continual pattern of regrettable behavior that left the parties on hostile terms. Perhaps inevitably, Richard sued, seeking judicial dissolution of the LLCs under section 7-80-810(2), C.R.S. 2018, as well as a declaratory judgment as to his and Paula's respective rights and obligations vis-a-vis the LLCs.

¶ 6 The district court appointed a receiver for the LLCs, but later decided that the receiver should act as a custodian during the

litigation.  Some time down the road, the court granted Paula's motion for summary judgment on the dissolution claim.  Following a trial, the court resolved the remaining issues.  Neither Richard nor Paula was entirely satisfied.  Both appealed.

¶ 7 The prior division held that the district court hadn't applied the right test in determining whether dissolution was appropriate.  Drawing primarily on case law from other jurisdictions, it gave a nonexclusive list of seven factors that a court must consider.  *Gagne I*, ¶ 35.  It remanded the case for additional proceedings to resolve genuine issues of fact material to those factors.[2]

¶ 8 On remand, the court held another trial on the judicial dissolution claim.  The court entered a thorough, well-reasoned order concluding that dissolution is appropriate.  Following another evidentiary hearing, the court entered another thorough, well-reasoned order setting forth how the dissolutions will proceed, essentially saying who will get what (and why).  In brief, the court

---

[2] The division also addressed declaratory judgment issues pertaining to HSI's role as property manager under the operating agreements, but because of the district court's decision on remand to dissolve the LLCs, those issues, with one exception discussed below, aren't before us.

ordered that Richard and Paula will each receive two of the apartment buildings — an in-kind distribution of LLC assets. This is to be accomplished by a so-called "drop and swap" exchange. Finding that Paula had engaged in a great deal of self-dealing misconduct, the court adjusted the parties' respective shares of the assets' values to account for money Paula had wrongfully pulled out of the LLCs.

¶ 9    Only Paula appeals.

## II.    Discussion

¶ 10    Paula's contentions on appeal fall into three general categories. First, she contends that the court erred, both legally and factually, in ordering dissolution of the LLCs. Second, she contends that the court erred in ordering an in-kind distribution of the LLCs' assets, rather than ordering the assets sold and resulting proceeds distributed to the members. Third, she contends that the court erred in ordering various adjustments to each member's side of the ledger. We aren't persuaded that the district court erred in any respect.

A. The Court Properly Ordered Dissolution

1. Legal Framework

¶ 11    Section 7-80-110(2) provides that

> [a] limited liability company may be dissolved
> in a proceeding by or for a member or manager
> of the limited liability company if it is
> established that it is not reasonably
> practicable to carry on the business of the
> limited liability company in conformity with
> the operating agreement of said company.

¶ 12    In *Gagne I*, the division held that "to show that it is not reasonably practicable to carry on the business of a limited liability company, a party seeking a judicial dissolution must establish that the managers and members of the company are unable to pursue the purposes for which the company was formed in a reasonable, sensible, and feasible manner." *Gagne I*, ¶ 31. In determining whether the party seeking judicial dissolution has met this burden, the court should consider the following seven nonexclusive factors:

(1) whether the company's managers are unable or unwilling to pursue the purposes for which the company was formed;

(2) whether a member or manager has committed misconduct;

7

(3)  whether it's clear that the members aren't able to work with each other to pursue the company's purposes;

(4)  whether the members are deadlocked;

(5)  whether the company's operating agreement provides a means of resolving any deadlock;

(6)  whether, in light of the company's financial condition, there remains a business to operate; and

(7)  whether allowing the company to continue is financially feasible.

*Id.* at ¶ 35.  No one factor is dispositive, and, conversely, a party seeking dissolution isn't required to establish all the factors.  *Id.* at ¶ 36.

<h3 align="center">2.    The District Court's Findings</h3>

¶ 13    The district court expressly addressed each of the seven factors identified above.  Its findings as to each factor were, in summary, as follows:

(1)  Paula and Richard are unwilling or unable to promote the purposes for which they formed the LLCs.  In particular, Paula has ensured that Richard can't actively participate in what were supposed to be joint

8

businesses — joint businesses created, in large part, so that Richard "would have an occupation and a means to support his family." She has done this by refusing to work with Richard in any way; shutting him out of any role in decision-making; terminating HSI's role as property manager without cause; and giving a primary business role to her other son, Jay, who also refuses to work with Richard. In short, Paula has rendered Richard a mere passive observer of the LLCs' operations, contrary to the operating agreements' acknowledgment that the success of each LLC "requires the active interest, support, cooperation, and personal attention of the members."

(2) Paula engaged in misconduct in managing the LLCs for several years. The court gave many examples. Most illustrate that Paula has treated the LLCs as her personal piggy bank. Paula took many actions with LLC funds which served no legitimate business purpose but only her own self-interest. These include unnecessarily loaning money to the LLCs on terms favorable to her,

9

distributing LLC funds to herself without good reason, paying "rent" to herself out of LLC funds, paying professionals working for her (rather than the LLCs), and paying Jay excessively from LLC funds. The court also found that Paula is likely to continue this course of action indefinitely.

(3) The members can't work with each other to pursue the LLCs' goals. There is "extreme animosity and distrust between them" and they can't deal with each other in a rational, objective way.

(4) The members are deadlocked because they can't agree on anything and there's no prospect of that changing.

(5) The operating agreements don't provide a way of getting around the deadlock. This is so mainly because the provisions dealing with HSI's role as property manager don't address the current circumstances.

(6) The LLCs are in good financial condition (despite Paula's misuse of LLC funds).

(7) Continuing to operate the LLCs is financially feasible.

¶ 14    The court concluded that "the factors weigh heavily in favor of dissolution."  Of particular concern to the court were "a fundamental failure of purpose," the fact that Paula had engaged in "substantial misconduct," and Paula's oppression of Richard. Though the court expressed "great reluctance" to dissolve the LLCs, it felt it had little choice given the "clearest evidence" of Paula's misconduct.

¶ 15    Two other aspects of the court's ruling are worth noting at this juncture: the court found that Richard had met his burden "by clear and convincing evidence if not beyond a reasonable doubt," and the court found Richard largely credible and Paula and Jay almost entirely incredible.

### 3.    Standard of Review

¶ 16    Whether to order dissolution of a limited liability company under section 7-80-110(2) is ultimately a decision within the district court's discretion.  *See In re 1545 Ocean Ave., LLC,* 893 N.Y.S.2d 590, 598 (N.Y. App. Div. 2010) (applying a statute almost identical to section 7-80-110(2); repeatedly cited with approval in *Gagne I*); *Mitchell, Brewer, Richardson, Adams, Burge & Boughman, PLLC v. Brewer,* 705 S.E.2d 757, 773 (N.C. Ct. App. 2011); *cf. Colt v. Mt.*

11

*Princeton Trout Club, Inc.*, 78 P.3d 1115, 1118 (Colo. App. 2003) (reviewing dissolution of a corporation for an abuse of discretion). A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or if it misapplies or misconstrues the law. *Rains v. Barber*, 2018 CO 61, ¶ 8; *Arabelle at Vail Square Residential Condo. Ass'n v. Arabelle at Vail Square LLC*, 2016 COA 123, ¶ 56 (addressing the equitable remedy of reformation).

¶ 17    But to the extent a party challenges the court's application of law or choice of legal standard, we review such challenges de novo. *Crocker v. Greater Colo. Anesthesia, P.C.*, 2018 COA 33, ¶ 15; *In re Marriage of Vittetoe*, 2016 COA 71, ¶ 17. And we review any challenges to the court's underlying factual findings for clear error. *M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1383-84 (Colo. 1994); *Van Gundy v. Van Gundy*, 2012 COA 194, ¶ 12. A court's finding of fact is clearly erroneous if there is no support for it in the record. *M.D.C./Wood*, 866 P.2d at 1384; *Van Gundy*, ¶ 12.

### 4.    Analysis

¶ 18    Paula challenges the district court's findings as to the five *Gagne I* factors which the court determined favor dissolution. Though we conclude she has a small, and ultimately unavailing,

point on the two deadlock factors, we otherwise reject her challenges.

### a. Failure of Purpose

¶ 19    Paula argues that the district court violated the parol evidence rule by going beyond the four corners of the operating agreements to determine the LLCs' purposes. *See Glover v. Innis*, 252 P.3d 1204, 1208 (Colo. App. 2011) ("[E]vidence of prior or contemporaneous agreements or negotiations may not be used to contradict a written instrument or to vary the terms of a written agreement."). Her argument fails for at least three reasons.

¶ 20    First, though Paula cites to page 1 of each of the operating agreements for the proposition that the purpose or each LLC is, in her words, merely "to own and operate a single apartment building," none of the operating agreements say that. None of them contain a purpose clause setting forth such a limited purpose of the LLC, and it's not possible to cobble together any clauses in the operating agreements to get to the same place.[3] So there's nothing in the

---

[3] For examples of purpose clauses in limited liability company operating agreements, take a look at *Fisk Ventures, LLC v. Segal*, No. CIV. A. 3017-CC, 2009 WL 73957, at *1 (Del. Ch. Jan. 13,

13

operating agreements that testimony or other extrinsic evidence about the members' purpose could even arguably contradict or vary. *See, e.g., Natanel v. Cohen*, No. 502760113, 2014 WL 1671557, at *1, *3, *5 (N.Y. Sup. Ct. Apr. 18, 2014) (unpublished opinion) (where limited liability company's articles of organization didn't mention the company's purpose, the court relied on testimony to determine that purpose).

¶ 21     Second, even when an operating agreement contains a statement of purpose, that's not necessarily the end of the matter. To be sure, a court must start with the operating agreement's language. *See, e.g., Meyer Nat. Foods LLC v. Duff*, No. CV 9703-VCN, 2015 WL 3746283, at *3-4 (Del. Ch. June 4, 2015); *Venture Sales, LLC v. Perkins*, 86 So. 3d 910, 915 (Miss. 2012); *see also In re 1545 Ocean Ave.*, 893 N.Y.S.2d at 596 ("[T]he dissolution of a

---

2009) (unpublished opinion), *aff'd*, 984 A.2d 124 (Del. 2009) (unpublished table decision); *In re Seneca Invs. LLC*, 970 A.2d 259, 263 (Del. Ch. 2008); *Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc.*, No. CIV. A. 13389, 1996 WL 506906, at *5 (Del. Ch. Sept. 3, 1996), *aff'd*, 692 A.2d 411 (Del. 1997) (unpublished table decision); *Venture Sales, LLC v. Perkins*, 86 So. 3d 910, 913 (Miss. 2012); and *Kirksey v. Grohmann*, 754 N.W.2d 825, 830 (S.D. 2008).

14

limited liability company . . . is initially a contract-based analysis."). But a court need not stop there. "A sensible interpretation of precedent is that the purpose clause is of primary importance, but other evidence of purpose may be helpful as long as the [c]ourt is not asked to engage in speculation." *Meyer Nat. Foods*, 2015 WL 3746283, at *4.[4]

¶ 22 Third, the court's finding doesn't truly contradict or vary anything in the operating agreements. Even if one could infer from the operating agreements alone that the purpose of the LLCs is to own and operate four apartment buildings, that wouldn't preclude an inquiry into *why* Paula and Richard decided to do that. One possible explanation for such a venture is that the members see an investment opportunity; that is, they are motivated only to make a profit. But that's not the only possible explanation, and it doesn't preclude other, additional explanations. The other explanation found by the district court — that Paula and Richard sought to provide Richard with an occupation and means to support his

---

[4] Paula doesn't argue that the court speculated as to the LLCs' purpose. Nor does she argue that the court's findings on that issue lack record support.

family — doesn't undermine, to any degree, the notion that the LLCs were formed to own and operate apartment buildings. It shows instead that owning and operating apartment buildings was a means to an end.[5]

¶ 23    We therefore see no basis for concluding that the district court applied the law incorrectly in assessing this factor. And given that the record supports the court's additional finding that Paula and Jay are unable and unwilling to allow Richard to have any role in managing the properties, we can't say that the district court erred in concluding that this factor favors dissolution.

### b.    Paula's Misconduct

¶ 24    We reject Paula's argument that the district court erred in finding that she engaged in numerous instances of misconduct because all of her actions were authorized by the operating agreements themselves; the Colorado Limited Liability Company Act

---

[5] We also observe that the court's finding of purpose is supported by those provisions of the operating agreement (1) acknowledging that the active efforts of *all* members are required for the LLCs to succeed and (2) making Richard's company, HSI, the property manager for each LLC.

16

(the Act), sections 7-80-101 to -1101, C.R.S. 2018; the business judgment rule; or all of the above.

¶ 25 The district court found that Paula changed the LLCs' books to reflect "distributions" to Richard so that she could make improper "distributions" to herself, unnecessarily loaned money to the LLCs on terms favorable to herself, improperly charged the LLCs "rent" for her use of her own home (in Indiana), made unjustifiable payments to Jay from LLC funds, relegated Richard to the status of a "silent partner," paid herself excessive management fees from LLC funds, paid professionals (from LLC funds) to protect her interests rather than the LLCs', and took numerous improper "reimbursements" from the LLCs for personal (and extravagant) expenses. The court also found that in doing all this, Paula acted only to benefit herself personally and without any legitimate business purpose. And in so finding, the court repeatedly found Paula's protestations to the contrary incredible. All of these findings enjoy substantial record support.

¶ 26 It's true that the operating agreements, the Act, and the business judgment rule would allow a manager of an LLC to do such things as make distributions to members, loan money to the

company, pay rent for use of space, hire and fire, seek the advice of professionals, earn reasonable management fees, and obtain reimbursement for expenses incurred while acting on the company's behalf. *See, e.g.*, § 7-80-404(5), C.R.S. 2018 (lending money to the company); § 7-80-407, C.R.S. 2018 (reimbursements for liabilities incurred in the ordinary course of business). But none of these sources of authority immunizes Paula from such acts taken purely for self-interest, in bad faith, and in breach of her fiduciary duties to the LLCs and their members.

- The operating agreements each provide that Paula must perform managerial duties "in good faith, in a manner [she] reasonably believe[s] to be in the best interest of the" LLC. The court found, with record support, that Paula didn't do so.[6]

- The Act says that managers must refrain from "engaging in grossly negligent or reckless conduct, intentional

---

[6] Paula accuses the district court of ignoring the operating agreements in resolving the issues presented. Far from it. The district court's orders in this case are replete with references to the operating agreements. It's plain to us that the district court considered them whenever appropriate.

misconduct, or a knowing violation of the law."
§ 7-80-404(2). And the Act requires managers and members to discharge their duties and exercise their rights "consistently with the contractual obligation of good faith and fair dealing." § 7-80-404(3);[7] *see also* § 7-80-407 (allowing reimbursements if payments were made "without violation of the person's duties to" the company). Members of a limited liability company formed under the Act also owe fiduciary duties to each other and to the company. *LaFond v. Sweeney*, 2012 COA 27, ¶ 38, *aff'd*, 2015 CO 3; *see JPMorgan Chase Bank, N.A. v. McClure*, 2017 CO 22, ¶ 25; *Long v. Cordain*, 2014 COA 177, ¶ 26. Again, the court found, with record support, that Paula breached these obligations.

- The business judgment rule "is a presumption that in making a business decision the [manager of a limited

---

[7] Section 7-80-108(2)(d), C.R.S. 2018, says that an operating agreement may not "[e]liminate the obligation of good faith and fair dealing under section 7-80-404(3)."

19

liability company] acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *see Rywalt v. Writer Corp.*, 34 Colo. App. 334, 337, 526 P.2d 316, 317 (1974).[8]  So by its own terms it doesn't apply if a manager acts in bad faith or without any reasonable belief that she is serving the company's best interests.  *See also Polk v. Hergert Land & Cattle Co.*, 5 P.3d 402, 405 (Colo. App. 2000); *Rifkin v. Steele Platt*, 824 P.2d 32, 35 (Colo. App. 1991); 3A Fletcher Cyclopedia of the Law of Corporations § 1040, at 52-53, Westlaw (database updated Sept. 2018).  The rule, therefore, offers no shelter to Paula.[9]

---

[8] The rule arose in the corporate context.  We assume it applies in the limited liability company context as well.

[9] Though Paula argues that she acted after seeking professional advice, professionals testified that they advised her in general terms about what a manager may do and did so based only on what she told them.  And such advice wouldn't insulate Paula from liability in any event because acts which may, in the abstract, be done legally

20

¶ 27   In sum, we conclude that the record supports the district court's finding that this factor favors dissolution.

### c.   The Members Can't Work With Each Other

¶ 28   Paula argues that because the operating agreement designates her as the sole manager for the LLCs, she gets to make the business decisions, and Richard can't complain about the decisions she makes.  In so arguing, Paula again ignores her contractual, statutory, and common law obligations of good faith.

¶ 29   Paula doesn't argue that she is able to work with Richard to pursue the LLCs' purposes.[10]  Given the record of prolonged animosity and conflict between Paula and Richard, any such argument would be meritless.

¶ 30   The record supports the district court's finding that this factor favors dissolution.

---

may still be taken for personal, as opposed to company, benefit. *Flippo v. CSC Assocs. III, LLC*, 547 S.E.2d 216, 221-22 (Va. 2001).

[10] Paula attempts to justify her actions in freezing out Richard by saying they were necessary "because of Richard's misconduct."  But the district court found that Paula had failed to prove her allegations against Richard.

¶ 31 Paula argues that because the operating agreements designate her the "Chief Executive Manager" with "primary responsibility" for managing the LLCs' operations, and give her "51% of the memberships' voting rights," there can't be any deadlock: she can make all management decisions unilaterally.

¶ 32 Were Paula right about the scope of her authority, she would have a persuasive argument that the district court erred as to this (and the next) factor. *See, e.g.*, *Meyer Nat. Foods*, 2015 WL 3746283, at *1, *3-4 (no deadlock where operating agreement provided that the manager would "manage[] exclusively"); *Lola Cars Int'l Ltd. v. Krohn Racing, LLC*, Nos. CIV. A. 4479-VCN, CIV. A. 4886-VCN, 2010 WL 3314484, at *22 (Del. Ch. Aug. 2, 2010) (no technical deadlock in day-to-day management given authority granted to the chief executive); *In re 1545 Ocean Ave.*, 893 N.Y.S.2d at 597 (no deadlock where operating agreement allowed each manager to act autonomously). But she is wrong.

¶ 33 The district court found that under section 4 of the agreements, Paula doesn't have a unilateral right to refuse to renew

HSI's contract to manage the properties.[11]  And that contract lies at the heart of the parties' dispute, for it was primarily through HSI that Richard maintained an active role in the LLCs and derived an income.[12]

¶ 34    We recognize that the district court may have gone too far in saying that because "the parties have not agreed on anything" there is a deadlock.  But the court's other findings concerning section 4 of the operating agreements support a finding that there is a real and material deadlock.  *See Rush Creek Sols., Inc. v. Ute Mountain Ute Tribe*, 107 P.3d 402, 406 (Colo. App. 2004) (an appellate court may affirm a trial court's ruling on any ground the record supports).  It follows that the court didn't err in concluding that this factor supports dissolution.

---

[11] Paula doesn't challenge this ruling on appeal.

[12] The *Gagne I* division held that there were genuine issues of material fact whether "there is a deadlock" and whether Paula has "the unilateral right to control all management of the properties," including making decisions under section 4 as to who will serve as the property manager.  *Gagne v. Gagne*, 2014 COA 127, ¶¶ 45-46.  The district court resolved those issues against Paula after trial.

### e. Way Around the Deadlock

¶ 35 Paula's only argument on this factor is that it can't support dissolution because there can't be a deadlock. As discussed above, the premise of her argument is incorrect: there is a deadlock. Because the court also found that the operating agreements don't provide a way around the section 4 deadlock, and Paula doesn't challenge that finding on appeal, we conclude that the district court didn't err in concluding that this factor favors dissolution.

### f. Conclusion

¶ 36 Though the final two factors — the companies' financial positions and whether continuation of the LLCs is financially feasible — don't favor dissolution, the other five do. Of particular concern are the facts that, due to Paula's actions, the LLCs aren't being operated consistently with their primary purpose; Paula has engaged in serious misconduct, freezing Richard out of all operations and acting to benefit herself at the LLCs', and, hence, Richard's expense; and the parties simply can't get along. Under similar circumstances, courts in other jurisdictions have concluded that dissolution of a limited liability company is appropriate. *E.g.,* *Meyer Nat. Foods*, 2015 WL 3746283, at *4-5; *Fisk Ventures, LLC v.*

*Segal*, No. CIV. A. 3017-CC, 2009 WL 73957, at *4 (Del. Ch. Jan. 13, 2009) (unpublished opinion) ("Given the Board's history of discord and disagreement, I do not believe that these parties will ever be able to harmoniously resolve their differences.") (footnote omitted), *aff'd*, 984 A.2d 124 (Del. 2009) (unpublished table decision); *Haley v Talcott*, 864 A.2d 86, 95-96 (Del. Ch. 2004) (one member ended another's managerial role, leaving that member "on the outside, looking in, with no power"; the status quo exclusively favored one of the fifty-percent members; parties couldn't function together); *Kirksey*, 754 N.W.2d at 827-31 (family members no longer spoke to each other, two members engaged in self-dealing, those members had "all the power" and no reason to change a status quo that benefitted only them, and other members had "no power to influence the company's direction"); *see also Lola Cars Int'l*, 2010 WL 3314484, at *22-24 (had member proved its claims of breaches of the operating agreements and bad faith, "judicial dissolution might very well [have been] appropriate" given the members' difficulty in "working together cooperatively").

¶ 37     For the foregoing reasons, we conclude that the district court didn't abuse its discretion in finding that "it is not reasonably

25

practicable to carry on the business of the [LLCs] in conformity with the operating agreement[s]" and therefore ordering dissolution. § 7-80-810(2); *see Gagne I*, ¶ 31.[13]

### B. The District Court Didn't Err in Ordering In-Kind Distribution of LLC Assets

¶ 38    To effectuate the dissolution, the court ordered an in-kind distribution of the four apartment buildings, with each member (or entity created by each member) to receive two of the buildings. To determine which building each would receive, account for Paula's misuse of LLC funds, and give effect to relevant portions of the operating agreements, the court took the following steps.

(1)  The court determined the equity in each of the apartment buildings (the LLCs' only assets). Adding it up, the court found total equity of $6,071,000.

(2)  The court deducted from that sum the amount of Paula's capital contribution — $2,025,000. (The operating agreements require her to receive back her

_____

[13] As the *Gagne I* division observed, "the test is whether it is reasonably practicable to carry on the business of the LLC, not whether it is impossible to do so." *Gagne I*, ¶ 33.

26

capital contribution before any other proceeds are distributed.)  This left $4,046,000 in total equity, or $2,023,000 equity for each of the fifty-fifty members.

(3) The court determined what adjustments should be made for Paula's misuse of funds.  That amount totaled $1,257,635.87.  Deducting $489,000 she had borrowed from herself, purportedly for the LLCs, through a revolving line of credit,[14] the court found that Paula owed the LLCs $768,635.87.  Because she is a fifty percent member, she must return half that amount — $384,317.94 — to the LLCs.  Adding Richard's legal fees of $400,000 (for which the court found Paula liable) resulted in a total adjustment of $784,317.94 in Richard's favor.

---

[14] As noted above, the court had previously found that Paula had created and used the line of credit as a way of siphoning money from the LLCs for her sole personal benefit.

(4) Fourth, the court used these figures to calculate the total equity owed to each member, as shown in this table:

|  | Richard | Paula |
|---|---|---|
| Half of net equity | $2,023,000.00 | $2,023,000.00 |
| Return of capital contribution | $0.00 | $2,025,000.00 |
| Adjustment for Paula's misfeasance | $784,317.94 | ($784,317.94) |
| Target equity to go to each member | $2,807,317.94 | $3,263,682.06 |

(5) Based on the appraised equity of each building, the court allocated two particular buildings to each of the members. As a result, Richard received equity of $2,914,500 and Paula received equity of $3,156,500.

(6) Last, subtracting from these respective equity totals the members' respective "target equity" amounts (see the table above), the court calculated that to reach those targets Richard must pay Paula $107,182.06.

28

¶ 39 The court ordered the distribution of the apartment buildings through a "drop and swap." The LLCs will distribute all four properties to both members as tenants-in-common. Each member will then convey his or her interest in the two properties he or she is not retaining to the other (or to an entity created by the other to take title to the properties). The parties may work together to make these transfers in a way that they qualify for tax advantages under 26 U.S.C. § 1031 (2018) (a 1031 exchange).

¶ 40 Paula's challenges to the district court's decision to require an in-kind distribution of the LLCs' assets are essentially three: such a distribution isn't allowed by the operating agreements; ordering such a distribution amounts to "piercing the corporate veil," for which the court didn't make any findings; and, even if an in-kind distribution is an appropriate way to dissolve and wind up the LLCs, a 1031 exchange isn't the right way to do it. These challenges fail.

### 1. Standard of Review

¶ 41 Judicial dissolution is essentially a proceeding in equity. *Brady v. Van Vlaanderen*, 819 S.E.2d 561, 563-65 (N.C. Ct. App. 2018) (corporate dissolution); *Scott v. Trans-System, Inc.*, 64 P.3d 1,

9 (Wash. 2003) (corporate dissolution); *Estate of Matteson v. Matteson*, 749 N.W.2d 557, 566 (Wis. 2008) (partnership dissolution); *see also Strang v. Osborne*, 42 Colo. 187, 195, 94 P. 320, 325 (1908) ("for good cause shown," a corporation may be dissolved by a "court of equity").[15]  Typically, a court has substantial discretion in determining an equitable remedy, and so we won't overturn a court's ruling fashioning such a remedy unless the party challenging it shows that the court abused its discretion. *See La Plata Med. Ctr. Assocs., Ltd. v. United Bank of Durango*, 857 P.2d 410, 420 (Colo. 1993) (reviewing court's choice of equitable remedies between limited partners); *Young Props. v. Wolflick*, 87 P.3d 235, 237 (Colo. App. 2003) (reviewing a court's partition order for an abuse of discretion).  We review any issues of contract and statutory interpretation, however, de novo.  *Laleh v. Johnson*, 2017 CO 93, ¶ 18 (contract interpretation); *Frazier v. Williams*, 2017 CO 85, ¶ 35 (statutory interpretation).

---

[15] We add, however, that a court can't exercise its equitable powers in this context in a way that contravenes the Act.

## 2. Analysis

### a. The Operating Agreements Don't Preclude In-Kind Distribution

¶ 42    In arguing that the operating agreements preclude in-kind distribution of assets, Paula relies on provisions giving her the "sole right" to sell LLC assets and saying that "in the event any assets are sold" the members agree "to fully cooperate in the use of a 1031 exchange through a qualified intermediary." Apparently, she asserts that such a sale and distribution is the only means of distributing assets.

¶ 43    The provisions at issue, sections 7A and 7B of the operating agreements, plainly apply to a sale (and arguably only to a sale by Paula). They don't purport to limit a court's options in the context of judicial dissolution, nor does anything else in the operating agreements.

¶ 44    Nor, contrary to Paula's suggestion, does the applicable operating agreement need to expressly authorize an in-kind distribution of assets before a court may order one. The Act expressly contemplates in-kind distribution in the event of a judicial dissolution and winding up of the company. §§ 7-80-803(1), -803.3(3), -813(2), C.R.S. 2018.

¶ 45    We therefore conclude that the operating agreements don't bar in-kind distributions.

   b.    The District Court Didn't Pierce the Corporate Veil

¶ 46    Next, Paula argues that the district court "pierced the corporate veil" without making the findings required to do so.

¶ 47    The district court didn't pierce the corporate veil. That happens when a court holds individuals liable for corporate obligations or liabilities because of the officers', directors', or shareholders' disregard or misuse of the corporate form. *See Stockdale v. Ellsworth*, 2017 CO 109, ¶¶ 18-20 (applying the doctrine to a limited liability company). The district court in this case did nothing of the sort. It only ordered distribution of assets as expressly allowed by the Act.

   c.    The District Court Didn't Err in Allowing a 1031 Exchange

¶ 48    Paula argues that even if an in-kind distribution isn't barred by the operating agreements, the type of in-kind distribution contemplated by the district court — a drop and swap 1031 exchange — isn't appropriate because (1) the Act's provisions allowing for in-kind distribution don't allow such a distribution to be accomplished in this way; (2) section 1031 doesn't allow an

32

exchange of limited liability company property; and (3) even if section 1031 allows such an exchange, it won't work here. These arguments don't require any extended analysis, because each fails for very straightforward reasons.

- Nothing in the Act, and section 7-80-803 in particular, supports Paula's argument that an in-kind distribution can't be ordered through a 1031 exchange. Though Paula objects that such an exchange "convert[s] the parties' interests and create[es] new interests," the Act plainly allows for a distribution in-kind to members. The court's decision to do this through a temporary creation of tenancies-in-common and subsequent transfers of these interests from each member to the other was driven by the parties' treatment of the four LLCs as essentially one business. As noted, the court has substantial discretion in fashioning an equitable remedy, and, in light of the lack of any express or implied statutory prohibition of the process chosen by the court, we don't see any abuse of that discretion.

- Paula cites no legal authority supporting her assertion that limited liability company property can't be subject to a 1031 exchange. The experts testified that swapping membership *interests* for each other or for real property can't qualify for section 1031 treatment. But at least one of them testified that once the properties are owned by tenants-in-common, they qualify for section 1031 treatment. So the district court ordered a process — involving initial transfers to the members as tenants-in-common — which will allow the parties to take advantage of section 1031 if doing so is something they want to pursue.

- In arguing that a 1031 exchange won't work, Paula points to a number of contingencies or steps that would need to occur, such as IRS approval, careful planning, and involvement by banks and title companies. She doesn't argue, however, that these are insurmountable obstacles. And, in any event, such an exchange is expressly contemplated by section 7B of the operating agreement and is merely an *option the court is allowing*

the parties to pursue. Though Paula says she will suffer negative tax consequences as a result of "los[ing] her gain in each LLC," she offers no legal argument in support of that contention. Nor does she explain how negative tax consequences could be avoided while still winding up the LLCs.[16]

¶ 49    For these reasons, we conclude that the district court didn't abuse its discretion by ordering an in-kind distribution of the LLCs' assets.

C.    The District Court Didn't Err In Computing Adjustments

¶ 50    Lastly, Paula challenges the district court's adjustments to the members' respective distributions to account for her misuse of LLC funds. The court made adjustments for payments to attorneys and other professionals, salary payments to Paula as manager, rent payments for "office space" at Paula's house, payments to Jay, payments for loans, payments for travel expenses (including meals),

---

[16] The court also concluded that because of the appreciation in the apartment buildings' values, liquidation (sale and distribution of the proceeds) would cause tax consequences "likely as great as those resulting from in-kind distribution." Paula doesn't challenge that conclusion.

the cost to repair one of the apartment buildings, improper distributions, and payments for vacation properties the LLCs don't own.  The court also ordered Paula to pay Richard's attorney fees and declined to make other adjustments requested by Paula for her legal fees.

¶ 51    Paula argues that she had both contractual and statutory authority to act as she did with respect to these matters.  In so arguing, however, she emphasizes her own testimony, Jay's testimony, and the testimony of certain professionals taken out of context and overstated.  As already noted, the district court found both Paula and Jay almost entirely incredible.  And the district court found that Paula had acted in her own self-interest, in bad faith, and without any legitimate business purpose.  Her arguments on this point are nothing more than an invitation to reweigh the evidence, an invitation which we decline.  *See M.D.C./Wood*, 866 P.2d at 1383-84 (the appellate court is bound by the trial court's findings of fact unless those findings are clearly erroneous); *IBC*

*Denver II, LLC v. City of Wheat Ridge*, 183 P.3d 714, 719 (Colo. App. 2008) (it's not the appellate court's role to reweigh the evidence).[17]

### III. Richard's Request for Appellate Attorney Fees

¶ 52 Citing a fee-shifting provision in the operating agreements, Richard asks that we order Paula to pay his attorney fees incurred on appeal. We grant his request. *Oster v. Baack*, 2015 COA 39, ¶ 37. We remand the case under C.A.R. 39.1 for the district court to determine the reasonable amount of attorney fees Richard has incurred in this appeal.

### IV. Conclusion

¶ 53 We commend the district court for its thoughtful consideration of the parties' evidence and arguments, its careful application of the applicable law, and its thorough and cogent orders resolving the relatively complex issues presented by the parties.

---

[17] Paula argues that the division in *Gagne I* approved of her attorney fees that the LLCs paid on her behalf. The division did so, however, in addressing Richard's contention that the district court erred in denying his motion to require Paula to disgorge those fees and, of course, based only on the record before it. The district court, after hearing quite a bit more evidence, changed its mind. The record supports the district court's decision to do so.

¶ 54    The judgment is affirmed.  The case is remanded to the district

court for a determination of his reasonable attorney fees incurred

on appeal.

JUDGE TERRY and JUDGE GROVE concur.