23CA1801 Marriage of Stone 11-14-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1801
El Paso County District Court No. 20DR31770
Honorable Diana K. May, Judge

---

In re the Marriage of

Christopher Everett Stone,

Appellee and Cross-Appellant,

and

Iryna Hermanova Stone, n/k/a Iryna Hermanova Mokhoshchokova,

Appellant and Cross-Appellee.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE GROVE
Freyre and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 14, 2024

---

Belzer Law, Aaron B. Belzer, Ashlee N. Hoffman, Boulder, Colorado, for
Appellee and Cross-Appellant

Mark Anthony Law, Mark Anthony Barrionuevo, Colorado Springs, Colorado,
for Appellant and Cross-Appellee

¶ 1    In this dissolution of marriage proceeding, Iryna Hermanova Stone, n/k/a Iryna Hermanova Mokhoshchokova (mother) appeals the portion of the district court's permanent orders allocating property and parental responsibilities between herself and Christopher Everett Stone (father).  Father also appeals, arguing the district court erred when it declined to enforce a marital agreement that purported to control the disposition of the marital property and committed a series of errors when it declined to declare an oral decree of dissolution a final judgment.

¶ 2    We reverse in part, affirm in part, and remand the case for further proceedings.

## I.    Background

¶ 3    Mother and father met in Ukraine in 2001 while father was on vacation looking for romance through a companion business.  Mother is from Ukraine and worked at the companion business as an interpreter.  The two started a romantic relationship, and in 2002, mother arrived in the United States on a marriage visa.

¶ 4    Father presented mother with an estate plan and, allegedly, a marital agreement.  Mother signed the estate plan, but as we explain further below, the district court found that she did not sign

1

the marital agreement. After the estate plan was signed, the couple married in Las Vegas on February 7, 2002. Father's parents witnessed the wedding.

¶ 5　The marriage produced two children. Until 2014, mother was the children's primary caretaker and father was the primary earner. He served in the United States Air Force before the marriage; while the parties were married, he worked as an engineer and executive until 2014.

¶ 6　According to father, mother's mental health began to decline in 2011. Among other things, father reported that mother attempted to abscond with their three-year-old son to Crimea in 2014, that she hoarded rotten food (leading to pest infestations and family illness), and that she engaged in a number of other troubling behaviors. As a result of mother's decline, father stated he stopped working — in part so that he could protect the children. In response, mother claimed father committed domestic violence against her, alienated the children from her, and forced her out of their marital home. Father filed for divorce on August 21, 2020.

¶ 7　The district court held a permanent orders hearing on July 20, 2021, that resulted in oral findings and an unsigned minute order

stating that the court had "enter[ed] a decree of dissolution." But two weeks later, on August 2, 2021, the court issued another order delaying the entry of permanent orders due to "serious concerns about [mother's] mental competence." To address these issues, the court appointed a guardian ad litem (GAL) "to represent [mother's] interests and report back to the court." On August 4, 2021, the court "revok[ed] the entry of the decree" and ordered that it would be withheld "until such time as the court's recent order requiring a GAL to assist [mother] and report back to the court is satisfied."

¶ 8     Several delays followed as the GAL opened a probate case for mother, and father changed attorneys. In February 2023, the parties agreed to bifurcate the proceedings. On May 9, 2023, the court issued permanent orders related to the decree of dissolution, the validity of the marital agreement, the partial division of marital assets, spousal maintenance, and attorney fees. On September 6, 2023, the district court issued permanent orders regarding parental responsibilities and the remaining marital property. Mother's appeal and father's cross-appeal followed.

## II. Mother's Claims

¶ 9    Mother contends that the district court (1) divided the parties' marital assets in a way that was manifestly unfair, inequitable, and unconscionable and (2) allocated parenting time and decision making responsibilities in a manner contrary to the children's best interests. We address each issue in turn.

### A. Property Division

#### 1. Additional Facts

¶ 10    The parties had substantial marital assets, almost all of which were in father's name. They had no marital debts. In addition to the family home and some personal property, the bulk of the marital assets were comprised of various investment, retirement, and bank accounts that had a total value of close to $5 million.

¶ 11    The district court found that father was "appropriately retired" and noted that the military had found him to be permanently disabled. Father's gross monthly income was $11,930.

¶ 12    The court found that mother was "unemployed, but capable of working." Because she would be "reentering the work force with little to no skills," the court imputed a minimum wage salary with "a gross monthly income of $2,366.00."

¶ 13    Mother was awarded the following:

- the value of father's thrift savings plan (TSP) and some other retirement investments;

- utilizing the time-rule formula, the "eight year percentage" of father's Federal Employee Retirement System (FERS) account after setting aside $100,000 as father's separate property;

- half of the value of the marital home;

- half of the value of a vehicle;

- half of the value of the marital portion of father's comic book collection;

- half of the marital savings and checking accounts;

- half of the value of the remaining household items; and

- $2,514 per month in lifetime maintenance with mother owing father $926 per month in child support.

¶ 14    Father was awarded the following:

- the entire Vanguard account;

- half of the value of the marital home;

- half the value of a vehicle;

- half of the value of the marital portion of father's comic book collection;

- half of the marital savings and checking account; and

- the remaining household items.

¶ 15    The district court ordered taxes to be split equally and did not total up the share of the marital estate awarded to each party.  On appeal, however, mother asserts that, with respect to the various investment and retirement accounts, father received an 83.45% share of the marital property (the entire Vanguard account, valued at $4,624,528), while she received only 16.55% (the TSP account and other retirement accounts, valued at $917,458).  Father does not contest these calculations.  (In addition, we note that, aside from the FERS account, which we address below, the remaining marital assets were divided equally, so they would affect the distribution by only a few percentage points even if they were added in.)

2.    Standard of Review and Applicable Law

¶ 16    In reviewing a district court's property division, we recognize that the court has great latitude to affect an equitable distribution based upon the facts and circumstances of each case.  *In re*

6

*Marriage of Hunt*, 909 P.2d 525, 537-38 (Colo. 1995). We review a court's factual findings for clear error. *In re Marriage of Powell*, 220 P.3d 952, 954 (Colo. App. 2009). We defer to the court's factual findings unless they are clearly erroneous. *In re Marriage of Connerton*, 260 P.3d 62, 66 (Colo. App. 2010). However, the court must make sufficiently explicit findings of fact to give the appellate court a clear understanding of the basis of its order. *In re Marriage of Rozzi*, 190 P.3d 815, 822 (Colo. App. 2008).

¶ 17   Thus, on review, an appellate court must not disturb a district court's decision regarding the division of property unless there has been a clear abuse of discretion. *Hunt*, 909 P.2d at 538. A court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair, or if it misapplies the law. *In re Marriage of Badawiyeh*, 2023 COA 4, ¶ 9.

¶ 18   The disposition of marital property is governed by the Uniform Dissolution of Marriage Act (UDMA). *In re Marriage of Balanson*, 25 P.3d 28, 35 (Colo. 2001). When dividing property between spouses, the district court must consider all relevant factors, including the contribution of each spouse to the acquisition of the marital property, the value of property set apart to each spouse, the

7

economic circumstances of each spouse, and any increases or decreases in values of separate property. § 14-10-113(1)(a)-(d), C.R.S. 2024. "[F]actors such as occupational experience, coupled with education, training, and business background should be considered in determining what division should be made of property." *Carlson v. Carlson*, 497 P.2d 1006, 1009-10 (Colo. 1972). The court's distribution of marital property must be equitable — not necessarily equal. *In re Marriage of Morehouse*, 121 P.3d 264, 267 (Colo. App. 2005).

### 3. Analysis

¶ 19 Mother contends that the district court abused its discretion by failing to consider all the relevant factors when dividing the marital property. She also argues that the court divided the marital assets inequitably. Mother asks us to reverse the district court's property division and (1) award her fifty percent of the value of the Vanguard account, (2) hold that the entire FERS account is marital property, and (3) award her half of the total value of the comic book collection.

¶ 20 While a district court "need not make specific findings as to each statutory factor," *Powell*, 220 P.3d at 959, its findings must be

specific "to give an appellate court a clear understanding of the basis of its order." *Rozzi*, 190 P.3d at 822. Here, the district court offered little explanation for why it awarded mother less than one-fifth of the marital property.

¶ 21 To be sure, the district court stated it "factored in [m]other's contributions" when dividing marital assets, found mother contributed to the household as "the homemaker," and considered the couple's economic circumstances. But aside from those conclusory statements, the court did not explain how the statutory factors outlined in section 14-10-113 shaped its decision to award at least eighty percent of the marital property to father.

¶ 22 Father's arguments on appeal are similarly thin. While he asserts that mother "contributed little financially to the marriage, trashed the family's homes, and abandoned her parenting responsibilities for ten years," and that "allocating cash" from the Vanguard account would have caused him to incur capital gains taxes, he does not engage with the statutory factors at all.

¶ 23 In addition, some of the district court's property division appears arbitrary or internally inconsistent. For example, the court evenly divided the marital checking and savings accounts without

knowing their value (due to father's failure to comply with orders to produce account statements) and without addressing mother's allegation that father had intentionally dissipated the assets in these accounts as the date for permanent orders approached. Similarly, even though the court drew "adverse inferences" against father for failing to produce a statement showing the value of the FERS account, it nonetheless proceeded to award $100,000 of that account to father as separate property — even though the overall value of the account was unknown.[1]

¶ 24     "To achieve an equitable division, the court must consider all relevant factors" under section 14-10-113(1). *In re Marriage of Smith*, 2024 COA 95, ¶ 64. And where, as here, the division of marital assets is substantially unequal, the need for a detailed explanation is particularly acute. We are unable to discern from the district court's order why its consideration of the statutory

---

[1] Notably, after awarding $100,000 of the value of the FERS account to father as separate property, the court awarded mother the eight-year percentage of the FERS account valued at the time of divorce. Even if the record included information about the total value of the account, it is not at all clear how (or even whether), in the pension context, a division under the time-rule formula could be combined with an allocation of part of the account's total value.

factors led it to allocate more than four-fifths of the marital property to father. In the absence of sufficient findings, the property division cannot stand. We therefore reverse the district court's property division and remand this issue to the district court for further consideration.[2] The court must consider the parties' economic circumstances at the time of the hearing. *In re Marriage of Burford*, 26 P.3d 550, 557 (Colo. App. 2001).[3]

## B.  Allocation of Parental Responsibility

¶ 25  Mother contends the district court applied the wrong legal standard when, as part of permanent orders, it restricted her parenting time. Alternatively, she argues the court abused its discretion when it allocated parenting time and decision-making

---

[2] The court's review should take into account all the parties' assets. This includes the re-evaluation of the FERS account, including the extent to which it is separate property. The court has already determined, with record support, that the marital portion of the comic book collection should be evenly divided based on a total valuation of $5,000.

[3] We note also that if property allocation is adjusted on remand, the district court must also re-examine mother's maintenance allocation and child support. *In re the Marriage of Jones*, 627 P.2d 248, 253 (Colo. 1981) ("Only after the property division has been made can the court determine, by application of the statutory standards, whether maintenance is necessary to provide for the reasonable needs of one of the parties.").

11

responsibility. She asks that we vacate the parental responsibilities order and specifically reallocate parenting time and decision-making responsibility. We are not persuaded.

### 1. Additional Facts

¶ 26 In its September 6, 2023, permanent orders, the district court awarded full parental responsibilities to father and determined mother should not have any parenting time or contact with the children. The court also ordered that mother must successfully complete her court-ordered therapy before it would consider any parenting time or reunification therapy.

### 2. Standard of Review and Applicable Law

¶ 27 The district court must determine the allocation of parenting time according to the child's best interests, "giving paramount consideration to the child's safety and the physical, mental, and emotional conditions and needs of the child." § 14-10-124(1.5), C.R.S. 2024. In making the best interests determination, the court must consider the factors set forth in section 14-10-124(1.5)(a)(I)-(XI). *In re Marriage of Finer*, 920 P.2d 325, 327 (Colo. App. 1996).

¶ 28 For a court to "impos[e] . . . a parenting time restriction," the court must find "that parenting time by the [restricted] party would

12

endanger the child's physical health or significantly impair the child's emotional development" and "enumerate the specific factual findings supporting the restriction," including findings related to child abuse. § 14-10-124(1.5)(a). "[W]hat constitutes endangerment to a particular child's physical or emotional health is a highly individualized determination . . . ." *In re Marriage of Parr*, 240 P.3d 509, 512 (Colo. App. 2010).

¶ 29 The determination of parenting time falls within the district court's broad discretion, and we will exercise every presumption that supports upholding the court's decision. *In re Marriage of Hatton*, 160 P.3d 326, 330 (Colo. App. 2007).

¶ 30 "It is the responsibility of the [district] court as the trier of fact to determine the credibility of the witnesses and the sufficiency, probative effect, and weight of the evidence." *Id.* We review de novo, however, whether the court applied the correct legal standards in determining parenting time. *In re Parental Responsibilities Concerning B.R.D.*, 2012 COA 63, ¶ 15.

¶ 31 When allocating decision-making responsibility under section 14-10-124(1.5)(b), a court shall generally consider (1) credible evidence of the parties' ability to cooperate and make decisions

13

jointly; (2) whether the parties' past pattern of involvement with the child reflects a system of values and mutual support that would indicate the parties' ability to provide a positive relationship with the child as joint decision-makers; and (3) whether an allocation of joint decision-making responsibility would promote more frequent contact between the child and each of the parties. Where a claim of child abuse is made, the court shall consider "[w]hether one of the parties has committed an act of child abuse or neglect as defined in section 18-6-401, C.R.S. [2024], or as defined under the law of any state, which factor must be supported by a preponderance of the evidence." § 14-10-124(4)(a)(I); *see also In re Marriage of McCaulley-Elfert*, 70 P.3d 590, 593 (Colo. App. 2003). Allocation of decision-making responsibilities falls within the court's sound discretion. *In re Marriage of Morgan*, 2018 COA 116M, ¶ 23.

### 3.   Analysis

¶ 32    Mother contends the court erred by restricting her parenting time without first making a statutory endangerment finding. *See* § 14-10-124(1.5)(a). Mother also argues the court abused its discretion when it allocated full decision-making responsibilities and parenting time to father.

¶ 33    The court's orders concerning parenting time include a robust discussion of the facts as well as detailed findings on the question of parental responsibilities.  Consistent with section 14-10-124(1.5)(a), the court made an endangerment finding, ruling that "[m]other's current mental health and state [are] injurious to the children."  The court supported this finding by relying on its own observations, those made by a previous judge assigned to this case, and psychological testing conducted on the children by a court-appointed evaluator.  While the court opined that father, too, was in "need of counseling," it found father's mental health "did not seem to negatively affect the children."

4.    Decision-Making Responsibilities

¶ 34    As for the allocation of decision-making responsibilities, the record reflects the district court's consideration of all the factors outlined in section 14-10-124(1.5)(b).  The court explained that it decided to award sole decision-making responsibility to father due to mother's mental health issues and her refusal to "engage with institutions," both of which would "make it very difficult if not impossible to ensure that schooling obligations and other appointments are met."  Mother disputes many of the court's

15

findings, but all of them have record support and we will not second-guess the district court's resolution of conflicting evidence. *See Gagne v. Gagne*, 2019 COA 42, ¶ 51 (appellate court will not reweigh evidence).

¶ 35　Because the court correctly applied the law and adequately explained its decisions with facts supported in the record, we will not disturb its allocation of parental responsibilities.

### III.　Father's Claims

¶ 36　In his cross-appeal, father contends the district court (1) erred when it found mother did not sign the marital agreement and (2) committed a series of errors when it ruled that the parties' marriage was dissolved by the order issued on May 9, 2023, rather than by the July 20, 2021, oral decree and accompanying minute order.

### A.　Marital Agreement

¶ 37　Father challenges the district court's finding that mother did not sign the marital agreement, arguing that the court (1) misapplied the burden of proof and (2) incorrectly assessed the evidence before it.　We perceive no error.

16

### 1.    Additional Facts

¶ 38    According to father, the division of the parties' marital property should have been governed by a marital agreement that he asserts mother signed before their wedding. The district court held a hearing on the validity of the marital agreement and found it invalid after concluding that mother did not sign it.

¶ 39    At the hearing, mother and father offered conflicting evidence as to whether mother was presented with and signed a marital agreement. They also disagreed as to whether father offered to have mother speak to an attorney before signing the agreement and whether father's parents witnessed the parties sign the agreement before their wedding.

¶ 40    A copy of the alleged agreement was presented to the district court, which focused its inquiry on whether mother actually penned the signature purported to be hers. Both sides presented handwriting experts who addressed the authenticity of the signature, but the court declined to credit either one.

¶ 41    Mother and father also testified about the circumstances surrounding the alleged marital agreement, and the court relied heavily on that testimony in making its findings. Father testified

that he pulled the agreement from the internet and that his parents witnessed them both sign it in the front room of the couple's home in Colorado Springs. Then, he said, all four of them flew to Las Vegas where the couple was married. Later, father claimed, mother stole the signature page of the marital agreement out of his safe room.

¶ 42 Mother testified she only signed an estate plan, and not a marital agreement. She denied being presented with or signing the alleged marital agreement and maintained that father's parents met the couple in Las Vegas, not Colorado Springs, just prior to the wedding. She admitted to taking the estate plan from the safe room, which she presented in discovery, but denied taking any marital agreement.

¶ 43 Based on this testimony and documentation presented to it, the district court found that mother proved "by a preponderance of the evidence she did not sign the [marital agreement]" and that there was "not a pre-marital agreement entered into by both parties." The court found it significant that the name of father's father (who was purportedly a witness to the signing) was misspelled on the signature block. It was also skeptical of father's

alleged timeline of his parents' visit, questioned why the estate plan and marital agreement purported to be signed on different days, and noted that mother's signature was absent on all the property asset pages related to the marital agreement.

2. Standard of Review and Applicable Law

¶ 44 We review de novo the district court's interpretation and application of the Colorado Marital Agreement Act (CMAA). *See In re Marriage of Zander*, 2021 CO 12, ¶ 13. A district court's factual findings are clearly erroneous only if there is no support for them in the record. *Van Gundy v. Van Gundy*, 2012 COA 194, ¶ 12. However, the legal conclusions the district court drew from those findings are reviewed de novo. *E–470 Pub. Highway Auth. v. 455 Co.*, 3 P.3d 18, 22 (Colo. 2000).

¶ 45 There is no dispute that the alleged marital agreement is governed by the CMAA, § 14-2-310, C.R.S. 1986, which was the version of the CMAA in effect in 2002.

¶ 46 Under the CMAA, a marital agreement is valid if it is in writing and "between prospective spouses made in contemplation of marriage or between present spouses, but only if signed by both

parties prior to the filing of an action for dissolution of marriage or for legal separation." § 14-2-302(1), § 14-2-303, C.R.S. 1986.

### 3. Analysis

¶ 47 Father first contends that the district court applied the wrong analytical framework when it concluded that mother had "proven by a preponderance of the evidence she did not sign the Agreement." As best we can tell, he seems to contend that once the court accepted the fact that the marital agreement existed, mother's defenses were limited by section 14-2-307, C.R.S. 1986, to, as father writes in his reply brief, "prov[ing] either that she did not sign the Agreement voluntarily or that there were no reasonable disclosures."

¶ 48 As support for his argument that the district court should have applied this framework, father relies on *Liberty Mortgage Corp. v. Fiscus*, 2016 CO 31, a case involving the enforceability of negotiable instruments under the Uniform Commercial Code. The holding in *Fiscus*, however, is inapposite. Marital agreements in Colorado formed between 1986 and 2014 are governed by the

20

CMAA,[4] which specifically sets forth the legal formalities necessary to form such agreements. *See In re Marriage of Ikeler*, 161 P.3d 663, 667 (Colo. 2007) (the CMAA specifies the requisite legal formalities of all marital agreements).

¶ 49 Under the CMAA, for an agreement to be considered a "marital agreement" it must be "signed by both parties." § 14-2-302(1), C.R.S. 1986. Relying on evidence presented at the hearing, the district court made a factual finding that mother did not sign the agreement. Building on this factual finding, the court correctly concluded that the document presented by father did not fit the CMAA's definition of a "marital agreement."

¶ 50 To the extent that father challenges the court's factual finding that mother did not sign the agreement, we reject his argument. There is ample record support for the court's finding, including mother's own testimony denying that the signature on the agreement was hers. The weight that the court gave to this testimony and the remaining evidence offered by both parties was

---

[4] The Uniform Premarital and Marital Agreements Act governs all marital agreements formed after 2014. *In re Marriage of Zander*, 2021 CO 12, ¶ 11 n.5.

within its discretion. *See Gagne*, ¶ 51; *In re Marriage of Young*, 2021 COA 96, ¶ 8 ("A court's factual finding is clearly erroneous if there is no support for it in the record.").

## B. Finality of the Decree

¶ 51　Lastly, father argues the district court's July 20, 2021, oral decree, which was reflected in an unsigned minute order, was a final decree of dissolution dissolving the parties' marriage. He contends that either the oral decree or the minute order should have been deemed final and asks that we remand the case with instructions to the district court to enter the decree of dissolution nunc pro tunc to July 20, 2021. We decline to do so.

### 1. Additional Facts

¶ 52　To recap, on July 20, 2021, the district court made findings on the record that, in addition to the other requirements of section 14-10-106(1)(a), C.R.S. 2024, the marriage was "irretrievably broken." The district court then orally stated it "enter[ed] a decree of dissolution." This oral decree was reflected in a minute order that was signed by the clerk, but not the judge. Shortly afterwards, the district court entered a "Order of Deferral of Decree," which stated that the court was both delaying entering a final order and revoking

22

the oral entry of a decree of dissolution in order to appoint a GAL for mother. Later, the court reiterated that it had "set aside" the oral decree referenced in the minute order.

¶ 53     In several different motions, father unsuccessfully sought to have the court reconsider its decision to set aside the July 20, 2021, oral decree. The district court denied each motion, stating repeatedly that the oral decree never met the C.R.C.P. 58 requirements for finality and that, in any event, the delay had become necessary once it became apparent that it was necessary to appoint a GAL for mother. *See In re Marriage of Sorensen*, 166 P.3d 254, 257 (Colo. App. 2007) (holding it is an abuse of discretion for a court to fail to appoint a GAL for a spouse in a dissolution of marriage proceeding when cognitive impairment is present).

¶ 54     The court entered a final decree of dissolution on May 9, 2023.

### 2.     Standard of Review and Applicable Law

¶ 55     Statutory interpretation is a question of law and is reviewed de novo. *Zander*, ¶ 13.

¶ 56     The UDMA governs divorce proceedings in Colorado. §§ 14-10-101 to -113, C.R.S. 2024. The Colorado Rules of Civil Procedure

apply to all proceedings under the UDMA unless specifically provided otherwise.  § 14-10-105(1), C.R.S. 2024.

### 3.    Analysis

¶ 57    Section 14-10-106(1) establishes the circumstances under which "the district court shall enter a decree of dissolution of marriage."  Father contends that the statute requires the court to enter a final decree as soon as it has found that (1) one of the parties has been domiciled in Colorado for ninety-one days prior to the commencement of the proceedings, (2) the marriage is irretrievably broken, and (3) ninety-one or more days have elapsed since it has acquired jurisdiction over the respondent.  § 14-10-106(1)(a)(I)-(III).  Likewise, he points out that C.R.C.P. 58(a) requires the court to "promptly" enter the final decree of dissolution and argues that the delay here violated that rule.  *See In re Sharp's Marriage*, 539 P.2d 1306, 1309 (Colo. App. 1975) (not published pursuant to C.A.R. 35(f)) (disapproving of a ten-month delay between a hearing and the final decree of dissolution but holding it was not an abuse of discretion).

¶ 58    We would be hard-pressed to say that the court's actions were "prompt" given that nearly two years elapsed between the hearing

24

(which led to the oral decree and the minute order) and the entry of the final decree of dissolution. But once mother's cognitive issues became apparent, the court was required to resolve them before dividing the marital property and allocating parental responsibilities. *See Sorensen*, 166 P.3d at 256-57 (holding that a court abuses its discretion by not appointing a GAL in a dissolution case when a spouse is mentally impaired to the degree that the spouse (1) is incapable of understanding the nature and significance of the proceeding; (2) is incapable of making critical decisions; (3) lacks the intellectual capacity to communicate with counsel; or (4) is mentally or emotionally incapable of weighing counsel's advice on the particular course to pursue in the spouse's own interest"); *cf.* C.R.C.P. 17(c) (providing that a court shall appoint a GAL for an incompetent person who is not otherwise represented in an action).

¶ 59 Moreover, the court was required to consider the financial and parental responsibilities issues "[i]n connection with [the] decree of dissolution of marriage." § 14-10-106(1)(b). And while the court certainly *could* have found that this was an exceptional case and bifurcated the proceedings, such a ruling would need to have been

premised on a finding that bifurcation was in the parties' collective best interests. *See id.*; *see also Est. of Burford v. Burford*, 935 P.2d 943, 951 (Colo. 1997) (observing that district court did not abuse its discretion when it found, among other things, that "the wife would not be placed at a disadvantage by the bifurcation order"). Yet father offered no reasons — either in the district court or in his appellate briefing — as to why that was the case, and instead focuses only on why bifurcation of the proceedings and an immediate entry of the decree would have benefited *him*.[5]

¶ 60     Thus, father's arguments concerning whether the court's actions satisfied the technical requirements of finality are largely beside the point. Father did not demonstrate that this was the type of "exceptional" case that warranted bifurcation, and the district court's delay was merited by its efforts to ensure mother's interests were adequately represented given her mental state. *See Sorensen,*

---

[5] We recognize that the court's order addressing the validity of the marital agreement and dividing marital assets, issued on May 9, 2023, could be read as suggesting that the proceedings were bifurcated when "Judge Miller reserved jurisdiction for everything but the actual dissolution of the marriage." However, our review of the record, in particular the court's order issued on February 18, 2022, establishes that neither the oral order nor the minute order was "a final order," nor was it "intended to be so."

26

166 P.3d at 256-57; C.R.C.P. 17(c). We accordingly perceive no error in the court's decision to defer the dissolution and the entry of a final order pending appointment of a GAL for mother and an evaluation of mother's mental health.

## IV. Attorney Fees

¶ 61 We deny mother's request for an award of appellate attorney fees under section 14-10-119, C.R.S. 2024. She did not raise the issue in her opening brief. *See* C.A.R. 39.1 (party seeking attorney fees for the appeal must, in their principal brief, explain the legal and factual basis for the award). We do not consider mother's answer-reply brief a "principal brief" for the purposes of section 14-10-119 because her request for fees under that statute did not depend on father's arguments on appeal.

¶ 62 Because father's arguments on appeal did not lack substantial justification, we reject mother's request for an award of appellate fees under section 13-17-102, C.R.S. 2024.

## V. Disposition

¶ 63 We reverse the district court's order dividing the marital property, and as a result, also reverse the court's awards of maintenance and child support. *See In re Singewald's Marriage,*

27

535 P.2d 252, 254 (Colo. App. 1975) (not published pursuant to C.A.R. 35(f)) (concluding awards of maintenance and child support were inextricably intertwined with the property division and the latter cannot be set aside without setting aside the entire order).

¶ 64    We affirm the district court's remaining orders and remand the case for further proceedings consistent with this opinion.

JUDGE FREYRE and JUDGE LUM concur.