23CA1473 Marriage of Gill 02-06-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1473
City and County of Denver District Court No. 22DR30213
Honorable Christine C. Antoun, Judge

In re the Marriage of

Dayana Borges Viana Gill,

Appellee,

and

Joseph Brandon Gill,

Appellant.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE FOX
Gomez and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 6, 2025

The Harris Law Firm, PLLP, Jason Thacher, Eric B. Limegrover, Denver, Colorado, for Appellee

Aitken Law, LLC, Sharlene J. Aitken, Denver, Colorado, for Appellant

¶ 1 Joseph Brandon Gill (husband) appeals the district court's permanent orders entered in connection with the dissolution of his marriage to Dayana Borges Viana Gill (wife). We affirm in part, reverse in part, and remand for further proceedings.

## I. Permanent Orders

¶ 2 In 2023, the district court dissolved the parties' seven-year marriage. The court directed the parties to exercise equal parenting time with their three children, and it allocated to wife sole decision-making responsibility. The court determined that the true value of the marital estate was $2,275,000 but allocated marital assets and debts to the parties. The court also ordered husband to pay wife $3,000 per month in maintenance and $7,074 per month in child support. In doing so, the court found that husband's gross income was over $30,000 per month and that wife's gross income was over $4,000 per month. The court then ordered husband to pay wife's outstanding attorney fees and costs — $43,446.95.

## II. Decision-Making Responsibility

¶ 3 Husband contends that the district court misapplied the law by allocating sole decision-making responsibility to wife. We disagree.

1

## A. Relevant Facts

¶ 4    Early in the dissolution proceeding, wife sought a civil protection order against husband. She alleged that he had been "physically, emotionally, psychologically and financially abusive" throughout the marriage. The court granted her a temporary protection order.

¶ 5    Following the permanent orders hearing, the court issued a permanent civil protection order, restricting husband's contact with wife. It found that husband had a history of domestic violence against wife, "resort[ed] to name calling and belittling behavior toward" her, and "harasse[d]" her with "vulgar and demeaning language" in their communications. It further found that husband engaged in this behavior to intimidate wife or retaliate against her and that his behavior would continue unless restrained.

¶ 6    Later, in its permanent orders ruling, the court incorporated its findings from the permanent protection order, and it found that joint decision-making was not in the children's best interests. The court explained that minimizing the conflict between the parents was better for the children, and it allocated to wife sole decision-making responsibility.

2

## B. Analysis

¶ 7 The allocation of decision-making responsibility is within the court's sound discretion, and we exercise every presumption in favor of upholding its decision. *See In re Marriage of Collins*, 2023 COA 116M, ¶ 8; *In re Marriage of Morgan*, 2018 COA 116M, ¶ 23. We will not disturb the decision absent a showing that the court misapplied the law or acted in a manifestly arbitrary, unreasonable, or unfair manner. *See Collins*, ¶ 8.

¶ 8 The court must determine the allocation of decision-making responsibility in accordance with the children's best interests and consider all relevant factors. *See* § 14-10-124(1.5)(b), C.R.S. 2024; *see also* § 14-10-124(1.5)(a); *Morgan*, ¶ 21. When the court finds by a preponderance of the evidence that a party has committed domestic violence, it shall not be in the children's best interests to allocate joint decision-making responsibility over a party's objection, unless the court finds that there is credible evidence that the parties can make decisions cooperatively in the children's best interests and in a manner safe for the abused party and the children. § 14-10-124(4)(a)(II)(A); *see also* § 14-10-124(4)(d) ("[T]he

court shall consider, as the primary concern, the safety and well-being of the child[ren] and the abused party.").

¶ 9    Husband highlights that the court relied on its determinations in the permanent protection order to allocate decision-making responsibility. However, we are not persuaded that by doing so, the court applied the wrong legal standard to reach its decision. Before allocating decision-making responsibility, the court reviewed the conflicting evidence and made detailed findings concerning the statutory best interests factors under section 14-10-124(1.5)(a). The court then incorporated its findings from the permanent protection order because it had found husband committed domestic violence and harassed wife in their communications. *See* § 14-10-124(4)(a)(II)(A), (4)(b), (4)(d). Given those findings and wife's objection to an allocation of joint decision-making responsibility, the court had to allocate decision-making responsibility to only one party, *unless* it determined from the credible evidence that wife and husband could make joint decisions safely and cooperatively in the children's best interests. *See* § 14-10-124(4)(a)(II)(A). The court did not make that finding. Rather, its findings suggested that the evidence established the contrary. *Cf. In re Parental Responsibilities*

*Concerning S.Z.S.*, 2022 COA 105, ¶ 21 (recognizing that a court's finding may be implicit in its ruling). The court then determined, with record support, that allocating wife sole decision-making responsibility served the children's best interests.

¶ 10　　Still, husband asserts that the court failed to consider the statutory factors in section 14-10-124(1.5)(b). But the court noted each of those factors in its order. Though the court did not make specific findings to address them, it was not required to do so, when, as here, its findings provided a clear understanding of the basis of its decision. *See In re Marriage of Rodrick*, 176 P.3d 806, 813 (Colo. App. 2007). Indeed, the court found that wife credibly testified that they had a "very abusive" relationship and that the children had observed husband's abuse, which had caused the children to experience long-term issues. *See* § 14-10-124(1.5)(b)(II), (4)(a)(II)(A). The court also noted that wife testified that she and husband were unable to communicate and make decisions together, and it found that joint decision making was not in the children's best interests. *See* § 14-10-124(1.5)(b)(I), (4)(a)(II)(A).

¶ 11　　However, husband contends that the child and family investigator (CFI) reported that the parties could make joint

decisions and recommended joint decision-making responsibility in her report. But the CFI later testified that since her report, "things seem to be very bad" between the parties, husband continued to harass wife, and he may use decision making as a way to control wife. The CFI then testified that she could "not see how they're going to share joint decision making." The court weighed this, and the other conflicting evidence, in determining that joint decision-making responsibility was not in the children's best interests. We may not reweigh the court's resolution of the conflicting evidence. *See Collins*, ¶ 13.

¶ 12    The court therefore did not abuse its discretion by allocating sole decision-making responsibility to wife.

### III.    Property Division

¶ 13    Husband next contends that the district court's allocation of the marital estate must be reversed. We conclude that the court's findings are insufficient and reverse this portion of the judgment.

### A.    Relevant Facts

¶ 14    Husband was a real estate investor. When seeking bank loans to facilitate his investments, he would complete personal financial statements. In a 2021 financial statement, he reported that his net

worth was $2,275,000, and other financial statements around this time also reported a net worth of approximately $2 million.

¶ 15    During the dissolution proceeding, husband submitted sworn financial statements that reported a significantly lower marital estate value. He also reported a consistently decreasing income in his sworn financial statements, and these reported incomes were significantly less than the income he reported in his 2021 financial statements.

¶ 16    The court found that husband's representations of the marital estate's value at the time of the 2023 hearing were not credible. It explained that he had "gone out of his way to deplete the marital estate and/or conceal its whereabouts" and that he had voluntarily cut off the income from his investment businesses to ensure that wife received "almost nothing." The court further explained that husband had wound down his businesses, engaged in "fishy" transactions, and hidden his assets. The court determined that the most accurate value of the marital estate was $2,275,000, which was the value he reported in the 2021 personal financial statement.

¶ 17    The court then issued the following orders to divide the marital estate:

- The court found that the marital home had a fair market value of $900,000 and that husband had depleted the home's equity by taking out 2 loans the month before the permanent orders hearing (a refinance for $460,181 and another loan of $62,233). The court determined the home was worth $440,000 and allocated it to wife.

- The court allocated to wife a 2015 Infiniti QX.

- The court allocated to wife the marital property presently in the marital home.

- The court allocated to wife two First Bank accounts.

- The court found that husband's businesses were worth $345,000, and it divided this equity equally between the parties, ordering husband to pay wife $172,500 for her share.

- The court allocated to husband approximately $147,000 of the parties' marital debt.

¶ 18     The court said this allocation was equitable, considering the $2,275,000 value of the marital estate.

## B. Allocation of the Marital Estate

¶ 19    Husband argues that the court's allocation resulted in wife receiving 96% of the marital property and that such an allocation "was inequitable and so lopsided" in wife's favor that it cannot stand. Because the court's findings do not sufficiently explain its allocation, we must reverse.

¶ 20    The court has great latitude to equitably divide the marital estate in such proportions as it deems just. *See* § 14-10-113(1), C.R.S. 2024; *In re Marriage of Medeiros*, 2023 COA 42M, ¶ 28; *see also In re Marriage of Wright*, 2020 COA 11, ¶ 3 (recognizing that while the court's property division does not need to be equal; it must be equitable). We will not disturb the court's allocation absent a showing that it abused its discretion. *Medeiros*, ¶ 28.

¶ 21    The court must allocate all marital assets and debts. *See In re Marriage of Page*, 70 P.3d 579, 582 (Colo. App. 2003) (noting the court's duty to do so, unless no evidence is presented on the unallocated asset or debt). And it must make sufficient findings concerning its allocation so that an appellate court can understand the basis of its ruling. *See In re Marriage of Gibbs*, 2019 COA 104, ¶ 9; *cf. In re Marriage of Powell*, 220 P.3d 952, 959 (Colo. App. 2009)

(stating that a court's property division findings must "allow the reviewing court to determine that the [court's] decision is supported by competent evidence"). "If property is omitted from permanent orders without explanation, the property division cannot stand." *Rodrick*, 176 P.3d at 815.

¶ 22 The court found that the total value of the marital estate was $2,275,000, which was the net worth husband reported on a 2021 personal financial statement before he depleted and concealed marital assets. The court then allocated to wife $612,500 from the marital home and husband's businesses. The court also allocated to her a vehicle, property in the marital home, and two bank accounts. The court did not specify the values of these additional assets. While the evidence conflicted, the record supports that the unvalued assets totaled, at most, approximately $16,000. The court allocated to husband $172,500 from his businesses as his only marital asset and approximately $147,000 of the marital debt.

¶ 23 Thus, when dividing the marital estate, the court addressed approximately $654,000 of the marital equity, and it awarded a substantial portion of that equity to wife. But the court did not allocate the remaining $1,621,000 of the marital estate. *See id.*; *see*

10

*also In re Marriage of Lockwood*, 971 P.2d 264, 267 (Colo. App. 1998) (providing that if the court finds that a party dissipated marital assets or otherwise engaged in economic fault, the court determines "the value of the asset when it last existed as marital property and equitably distribute[s] that value to the parties"). Nothing in the permanent orders indicated that wife received a portion of this significant marital equity. Nor did the court expressly allocate it to husband. Moreover, any suggestion that the court implicitly allocated this remaining equity to husband would appear inconsistent with its findings of economic fault and reward him with the additional marital equity he improperly concealed and depleted from the marital estate. *See In re Marriage of Campbell*, 140 P.3d 320, 322 (Colo. App. 2006) (recognizing that the court may consider economic fault in cases where a party dissipates marital assets in contemplation of the dissolution).

¶ 24 Without further findings by the court, we are unable to discern how the court allocated this substantial portion of the marital estate. *See Rodrick*, 176 P.3d at 815; *cf. In re Marriage of Balanson*, 25 P.3d 28, 36 (Colo. 2001) (stating that errors in the court's property division are reversible when the aggregate effect of the

11

errors affects a large percentage of the marital estate).  Absent such findings, we are unable to review the propriety of the court's allocation.  *See Gibbs*, ¶ 9; *Powell*, 220 P.3d at 959.

¶ 25    In addition, as husband argues, the court failed to allocate the "Zales" account x3546 and Capital One account x8400 debts and a 2016 Cadillac Escalade.  *See Rodrick*, 176 P.3d at 815.  The court also failed to address the conflicting evidence concerning the values of these items.

¶ 26    We therefore reverse the court's property division.  On remand, the court shall reconsider its determination and make findings sufficient to explain the basis of its allocation.  In doing so, the court must clarify (1) the values as of the date of the permanent orders hearing for the marital assets and debts unvalued by the court and (2) its allocation of the entirety of the $2,275,000 marital equity.  *See* § 14-10-113(5).  The court must also rely on the parties' economic circumstances at the time of the remand to determine the equitable allocation of the estate.  *See In re Marriage of Wells*, 850 P.2d 694, 696 (Colo. 1993); *see also In re Marriage of Corak*, 2014 COA 147, ¶ 21 (noting the court may take additional evidence on remand concerning the parties' economic circumstances).

## C.    Additional Property Division Contentions

¶ 27    Since on remand the district court cannot revalue the marital assets and debts (as it determined in its permanent orders) or recharacterize its classification of the marital property, *see Wells*, 850 P.2d at 697 n.6; § 14-10-113(5), we consider husband's contentions that the court erred by (1) determining the total value of the marital estate was $2,275,000; (2) omitting a purported $437,365 loan that he executed with his father; (3) declining to set aside $66,490 from his businesses as his separate property; and (4) finding that he refinanced and took out two loans on the marital home a month before the permanent orders hearing.  We will not disturb the court's determinations.

### 1.    Value of the Marital Estate

¶ 28    When the court finds that a party has engaged in economic fault and dissipated marital assets in contemplation of the dissolution of the marriage, the court may value assets as of the date they last existed as marital property.  *Campbell*, 140 P.3d at 322.  Whether a party dissipated marital assets is a question of fact, and we will not disturb the court's finding unless it has no record support.  *See In re Marriage of Smith*, 2024 COA 95, ¶ 76.

13

¶ 29    The record supports the court's finding that husband engaged in economic fault by improperly concealing and depleting marital assets, and, thus, it did not err by valuing the marital estate at $2,275,000 based on a value husband reported in a pre-dissolution financial statement.  *See id.*; *Campbell*, 140 P.3d at 322; *see also In re Marriage of Nelson*, 2012 COA 205, ¶ 27 ("[W]e must construe the evidence in the light most favorable to the prevailing party.").

¶ 30    Wife's expert witness testified that husband failed to provide "quite a bit of information" regarding his financials, that he commingled his business and personal finances, and that he made his financials "willful[ly] complex[]."  The expert also reported after the dissolution was initiated, "there [was] a drawdown of all of [husband's] various different entities, assets and accounts," despite normal operations before that time.  The expert opined that, as a result of husband's conduct, his pre-dissolution financial statements best indicated the true value of the marital estate.

¶ 31    Husband highlights other evidence presented at the hearing that, in his view, conflicted with the court's determination.  However, the court did not find husband credible on this topic and noted that his "incomplete information and representations"

rendered other evidence concerning his finances unreliable. We may not set aside the court's resolution of this conflicting evidence. *See Smith*, ¶ 50 (recognizing that credibility determinations and the weight, probative force, and sufficiency of the evidence, as well as the inferences and conclusions to be drawn therefrom, are matters within the district court's sole discretion); *cf. In re Marriage of Sgarlatti*, 801 P.2d 18, 19 (Colo. App. 1990) (determining that a party's refusal to make willing disclosures of his financial status authorized the court's adverse inference that he was concealing additional income).

¶ 32 The court thus acted within its discretion to value the marital estate at $2,275,000, in accordance with husband's reported net worth before concealing assets and dissipating the marital estate.

### 2. Purported Loan from Husband's Father

¶ 33 When allocating the parties' marital debts, the court declined to include a purported $437,365 loan that husband claimed he executed with his father. The court found that this was not an actual debt, and the record supports that finding.

¶ 34 The classification of money as a debt or a gift is dependent on the court's resolution of factual disputes, and we defer to its

15

determination when supported by the record. *See In re Marriage of Hoffman*, 650 P.2d 1344, 1345-46 (Colo. App. 1982). Debts incurred during the marriage are subject to the court's allocation, but gifts are not. *See id.*; § 14-10-113(1), (2)(a).

¶ 35 During the dissolution case, husband executed a promissory note with his father for $437,365. Wife argued that this was not an actual loan and testified that husband had not made any payments toward the loan. Wife's expert also opined that the money husband received from his father was not a loan. The court resolved the conflicting evidence and determined that the money husband received from his father was not an actual, outstanding debt. The court explained that husband's transactions with his father were "fishy" and that it was not convinced husband had to pay this money back. We will not disturb the court's factual determination. *See Smith*, ¶ 50; *see also First Nat'l Bank v. Honstein*, 355 P.2d 535, 536 (Colo. 1960) ("Transfers of property between parents and children are presumed to be gifts until the contrary is clearly and unequivocally shown.").

¶ 36 Still, husband claims that the court's exclusion of this purported loan was inconsistent with its determination of the

marital estate's value because this purported loan was listed as a debt on his pre-dissolution personal financial statement. But neither the 2021 personal financial statement relied on by the court to determine the $2,275,000 estate value nor any other personal financial statement identifies the purported loan to husband's father.

¶ 37 The court thus did not err by finding that husband's purported loan from his father was not a valid debt.

### 3. Husband's Alleged Separate Property

¶ 38 Husband argued to the district court that before the marriage, one of his businesses had a premarital value of $66,490 and that this amount should be set aside to him as his separate property. The court was not persuaded. Husband argues that this was error because the undisputed evidence showed that he had a separate property interest in his businesses. We disagree.

¶ 39 The parties' joint expert witness reported that husband formed Urban Land Acquisitions LLC before the marriage, and he noted that the premarital value of that business likely was $66,490. While a premarital interest could be set aside to husband as his separate property, *see* § 14-10-113(1)-(2), the expert went on to

testify that Urban Land Acquisitions had ceased operations and that this business had no present value. Thus, even if we assume that Urban Land Acquisitions had a premarital value, that separate property interest did not exist at the time of the permanent orders hearing. It therefore could not be set aside to husband. *See In re Marriage of Turner*, 2022 COA 39, ¶ 15 (noting that the court makes "the determination of whether something is property at all" on the date of the permanent orders hearing when that hearing precedes the decree).

¶ 40 To the extent husband suggests that this separate property interest still existed, he directs us to no evidence from the hearing in support of that suggestion or that showed he used any portion of the premarital property to acquire a different asset during the marriage. *See Smith*, ¶ 41 (recognizing that property acquired in exchange for separate property retains its separate character if the party seeking to establish it as separate property meets their burden of tracing it back to a separate asset).

¶ 41 The court thus did not err by declining to set aside $66,490 as husband's separate property.

### 4. Marital Home Debt

¶ 42 Husband also argues that nothing in the record supports the court's finding that he "refinanced and took 2 loans out of the [marital] home in April of 2023[,] . . . basically depleting the proceeds of the sale of the home for his own benefit." He asserts that the two loans associated with the marital home were executed before April 2023, and that the court appeared to misinterpret his property division spreadsheet, which reported the April 2023 balance of these loans. Even if we assume that the court misstated the date of these loans, husband develops no argument to explain how that misstatement affected the court's judgment or impacted his substantial rights. *See* C.A.R. 35(c) (noting that we may disregard any error of defect that does not affect the parties' substantial rights). We therefore will not further address it. *See Collins*, ¶ 56 (declining to address an undeveloped argument).

¶ 43 In sum, we will not disturb the court's determinations concerning the marital estate's total value, the $473,365 purported loan, husband's alleged separate property, and the marital home debt.

## IV. Maintenance, Child Support, and Attorney Fees

¶ 44 Husband next contends that the district court incorrectly determined the parties' incomes for purposes of deciding maintenance and child support, made insufficient findings in support of its child support determination, erred by awarding wife $3,000 per month in maintenance, and improperly ordered him to pay wife's outstanding attorney fees and costs under section 14-10-119, C.R.S. 2024.

¶ 45 However, when a court is required to revisit the property division on remand, it must re-evaluate maintenance in light of the updated property division. *See In re Marriage of de Koning*, 2016 CO 2, ¶ 26 ("[A]wards of spousal maintenance . . . flow from the property distribution . . . ."). The court also must redetermine the child support obligation. *See de Koning*, ¶ 22; *cf. In re Marriage of Salby*, 126 P.3d 291, 301 (Colo. App. 2005) ("[T]he issues of child support and maintenance are inextricably intertwined."). And when the court reconsiders maintenance and child support, it must base its decision on the parties' financial circumstances at the time of the remand. *See Wright*, ¶ 24; *In re Parental Responsibilities Concerning M.G.C.-G.*, 228 P.3d 271, 273 (Colo. App. 2010).

20

Following the court's reconsideration of property division, maintenance, and child support, it must re-evaluate whether to award section 14-10-119 attorney fees and costs. *See de Koning*, ¶ 26; *In re Marriage of Morton*, 2016 COA 1, ¶ 33.

¶ 46    Given that the court must revisit these issues on remand, we decline to address husband's contentions concerning the court's determinations on incomes, maintenance, child support, and attorney fees and costs. However, when the court addresses these issues on remand, it must adhere to the directives in sections 14-10-114, C.R.S. 2024, 14-10-115, C.R.S. 2024, and 14-10-119. *See also In re Marriage of Aragon*, 2019 COA 76, ¶ 22 (directing the court to conduct a lodestar analysis when determining the reasonableness of attorney fees under section 14-10-119). It also must make all required statutory findings, address the statutory factors relevant to its determinations, and make findings sufficient to explain the reasons for its decisions. *See Wright*, ¶ 23; *Gibbs*, ¶ 9; *see also In re Marriage of Aldrich*, 945 P.2d 1370, 1378 (Colo. 1997) ("In awarding fees and costs under section 14-10-119, the district court must . . . mak[e] findings that explain how and why it arrived at the specific amount of the award.").

## V.  Appellate Attorney Fees

¶ 47    Wife requests an award of appellate attorney fees under C.A.R. 38(b), arguing that husband's appeal was frivolous.  Given our disposition, we do not agree and, therefore, deny this request.  *See In re Marriage of Martin*, 2021 COA 101, ¶ 42.

## VI.  Disposition

¶ 48    We affirm the district court's allocation of decision-making responsibility.  We reverse the portion of the judgment that divided the marital estate and, as a result, direct the court to reconsider that determination and the other financial decisions that flow from property division.  The case is remanded for further proceedings consistent with this opinion.  Those portions of the judgment not challenged on appeal remain undisturbed.

JUDGE GOMEZ and JUDGE LUM concur.