### In re the MARRIAGE OF Carol POWELL, Appellee,

### and

### David Powell, Appellant.

### No. 06CA1369.

Colorado Court of Appeals, Div. III.

Feb. 5, 2009.

Dale E. Johnson, P.C., Dale E. Johnson, Louisville, Colorado, for Appellee.

Stevens, Littman, Biddison, Tharp & Weinberg, LLC, Andrew C. Littman, Craig A. Weinberg, Boulder, Colorado, for Appellant.

Opinion by Judge ROY.

David Powell (husband) appeals from the trial court's permanent orders in the dissolution of marriage action between him and Carol Powell (wife) relating to property division, maintenance, and attorney fees. We vacate the property division, maintenance, and attorney fees orders, and remand the case for further proceedings consistent with the views expressed in this opinion.

## I. Preliminary Matters

### A. Preparation of Permanent Orders

■ At the outset, we agree with husband's argument that we must carefully scrutinize the permanent orders because the trial court adopted orders prepared by wife's counsel without, or with only minor, revision.

[2] A trial court's adoption of one party's proposed findings and conclusions is not necessarily improper and does not require reversal unless the findings themselves are inadequate. C.R.C.P. 121 § 1–16; *In re Marriage of Martinez,* 77 P.3d 827, 830 (Colo.App.2003). Here, we have extensively reviewed the record, including the testimony of the parties, the testimony of the experts, the exhibits, and the permanent orders. With the exceptions noted later in this opinion, the record supports the findings, conclusions, and orders of the trial court.

### B. Waiver

■ Further, wife argues that husband has waived his right to appeal the property division in the permanent orders by accepting his share of the marital property. We disagree.

Wife's argument reflects the general rule that one who has accepted the benefits of a judgment may not seek reversal of that judgment on appeal. That rule is not strictly applied in dissolution of marriage cases, *In re Marriage of Burford,* 950 P.2d 682, 684 (Colo.App.1997), and it does not apply here because husband seeks a greater share of the property division, and his rights to the benefits already received would not be affected. *See In re Marriage of Antuna,* 8 P.3d 589, 592 (Colo.App.2000).

## II. Stock Options

Husband first argues that the trial court erred in classifying a portion of wife's stock options granted during the marriage as separate property and in valuing them. We agree with the first argument and under the circumstances do not address the latter.

### A. The Facts

The parties were married September 23, 2000, and the decree dissolving the marriage was entered June 22, 2006, nunc pro tunc May 1, 2006. At the time of the marriage, wife was the chief financial officer of a division of a chain of department stores, from which she retired when her position was eliminated on May 30, 2003. Her compensation included annual stock options; however, only those options granted on February 27, 2001 (the 2001 options) are in dispute here.

The fiscal year of the department store company is February 1 through January 31 of the following calendar year. The 2001 options granted wife options to purchase 5,747 shares of stock for $19 per share: 1,437 options vesting each year on February 27, 2002, 2003, and 2004, and 1,436 vesting on February 27, 2005, with all expiring February 27, 2011. There was a two-for-one stock split in 2005, which modified the 2001 options to 11,494 shares at $9.50 per share.

### B. Standard of Review

■ In reviewing a trial court's division of property, an appellate court must recognize that the trial court has great latitude to effect an equitable distribution based upon the facts and circumstances of each case. Thus, on review, an appellate court can not disturb a trial court's decision regarding division of property unless there has been a clear abuse of discretion. *In re Marriage of Balanson,* 25 P.3d 28, 35 (Colo.2001). The standard of review with respect to the trial court's findings of fact is clearly erroneous. *Boulder Meadows v. Saville,* 2 P.3d 131 (Colo.App.2000). However, the interpretation of a contract, here a stock option plan, is a question of law which is reviewed de novo. *Rhino Fund, LLLP v. Hutchins,* 215 P.3d 1186, 1190 (Colo.App. 2008).

### C. Marital Property versus Separate Property

■ Once a court determines an interest constitutes property, it must determine whether the property is marital or separate. All property acquired during the marriage is presumed to be marital property, unless it falls within the listed exceptions. § 14–10–113(2)–(3), C.R.S.2008. As pertinent here, "an asset of a spouse acquired prior to the marriage ... shall be considered as marital property, for purposes of this article only, to the extent that its present value exceeds its

value at the time of the marriage." § 14–10–113(4), C.R.S.2008. Property must be realistically classified based on the nature of the asset. *In re Marriage of Holmes,* 841 P.2d 388, 389 (Colo.App.1992).

The issue as framed by husband is whether the 2001 options to purchase 7,356 shares—that is, options to purchase 11,494 shares prorated from February 1, 2000 to September 22, 2000—granted to wife on February 27, 2001 by the department store company, are marital or separate property. The matter was litigated in the trial court primarily on the issue of whether the options were granted for past or future services.

### 1. Trial Court Proceedings

Wife testified that a portion of the 2001 options was "earned" prior to the marriage and should be treated as separate property. She also testified that the 2001 options survived her retirement and would continue to vest and remain vested.

Wife's expert testified that the 2001 options were for past services, and, based on the stock option plan and a conversation with a company official, the options remained hers after her retirement. Wife's expert classified all of the 2001 options as marital.

Husband's expert witness testified that there were 15,056 options granted prior to the marriage and 20,336, including the 2001 options, granted after the marriage. He also testified that, in his opinion, the 2001 options were granted for future services.

In her written closing argument, wife argued that "[t]here are 15,056 vested (and unexercised) stock options that were granted shortly before the marriage (February 1999 and February 2000). There are also 20,336 vested (and unexercised) that were granted *during* the marriage." (Emphasis supplied.) Wife's closing argument did not ask for a proration of the 2001 options.

In its first post-hearing order, the trial court held that the 2001 options were granted for past services and that those *"acquired* prior to the marriage [7356 shares] but not yet vested were wife's separate property." (Emphasis added.) In its second order, the trial court stated:

> The Court adopts the arguments propounded by [wife's] counsel in whole, with

the following exception pertaining to the 22,412 premarital [department store company] options [i.e., 15,056 options granted before the marriage and 7,356 of the options granted in 2001], which the Court has determined to be the separate property of [wife]. In finding and concluding that these options are the separate property of [wife], the Court is also cognizant that there is a marital component to [wife's] separate property to the extent that there may have been an appreciation in the value of those options during the course of the parties' marriage.

In summary, there appears to be no dispute that the 15,056 options granted to wife prior to the marriage through February 2000 are her separate property, and that the 2001 options to purchase 11,494 shares were granted after the marriage in February 2001. The trial court concluded that the 2001 options were awarded for services rendered in 2000; prorated them to the date of the marriage as wife urged in her testimony; and concluded that of the options to purchase 11,056 shares, 7,356 were wife's separate property.

### 2. The Stock Option Plan

The department store company had a non-qualified stock option plan effective May 20, 1997 and terminating May 19, 2007, subject to the rights and obligations granted under the plan and then in effect. The plan governed the grant to wife made on February 27, 2001.

The plan document provided that the plan was to be administered by a committee of the board of directors. With respect to grants, "non-qualified stock options *may* be granted by the Committee at any time and from time to time prior to the termination of the Plan to [certain] employees of the Company." (Emphasis added.) In addition: (1) the committee would establish the option price; (2) each option granted would be exercisable in such manner and at such times as determined by the committee but no later than ten years after the grant; (3) the options were not transferable except by will; and (4) the committee was authorized to include other provisions not inconsistent with the stated

terms, provided no option would give the optionee any right to continued employment or limit the company's right to terminate his or her employment. Further, termination of the plan would not affect the rights and obligations granted under the plan. And, finally, in the event the shareholders of the company agreed to sell all of the outstanding shares or all of the assets of the company, or a similar transaction, the granted options were immediately exercisable.

The literature with respect to the stock option plan advised employees that: (1) one quarter of the options granted would vest annually in each of four years; (2) if the employee was terminated for cause, all unexercised options expired on the date of termination; and (3) if the employee's employment was terminated by disability, retirement, or death, the employee or his or her estate had twelve months to exercise the vested options, subject to the ten-year term of the options. Neither the plan nor the literature stated whether the options were granted for past or future services.

However, wife received a letter from the company shortly after her retirement, perhaps as part of a negotiated package, stating, contrary to the plan and as pertinent here, that she had until May 30, 2007 (four years after retirement) to exercise the options and that they would continue to vest until that date. If the letter is controlling, and the parties apparently agree that it is, the options to purchase the 7,356 shares in question had fully vested prior to the decree, subject to the expiration of the grant on May 30, 2007.

### 3. Analysis

The controlling cases on the treatment of stock options in dissolution of marriage matters are *In re Marriage of Miller*, 915 P.2d 1314 (Colo.1996), and *In re Marriage of Balanson*, 25 P.3d 28 (Colo.2001).

In *Miller*, the husband's employer granted stock options to high level or high performing employees. In characterizing stock option plans in general, the court, in part, stated:

An employee stock option is a contractual right to purchase stock during a specified period at a predetermined price. While there is no requirement that the option period be limited to a certain duration for nonstatutory stock options, the option period is typically ten years....

An optionee's right to exercise an employer-granted stock option is typically related in some manner to the optionee's employment status. By relating an optionee's rights to exercise stock options to the optionee's employment status, an employer is able to use stock options as an incentive to employees to continue employment with the employer. An employer may provide for more liberal exercise conditions if the termination of employment occurs by reason of retirement, death, or disability, and may provide for more restrictive exercise conditions if the termination of employment is for "cause" or for other circumstances deemed not to be in the interest of the company.

*Miller*, 915 P.2d at 1317 (citations omitted). This description of stock options closely parallels the stock options at issue here.

In discussing a property right in a stock option, the court stated:

A nonvested interest is an expectancy and not property because the holder has no enforceable rights. Thus, a stock option might be deemed nonvested for purposes of determining its status as marital property if the grant of the option were conditional.

*Id.* at 1318 (citations omitted).

The court then concluded:

[T]o the extent an employee stock option is granted in consideration of past services, the option may constitute marital property when granted. On the other hand, an employee stock option granted in consideration of future services does not constitute marital property until the employee has performed those future services.

*Id.* at 1319 (citations omitted).

In the second case, *Balanson*, both the trial court and a division of this court read the term "vested" in *Miller* as meaning "exercisable." 25 P.3d at 39. The supreme court held that this was a misreading of *Miller*, stating:

We disagree with this interpretation of *Miller*. As we noted in *Miller*, "[c]haracterizing ... options as nonvested, though perhaps accurate for purposes of employee benefits and tax law, may be misleading for purposes of ascertaining what interests are marital property for purposes of the [Uniform Dissolution of Marriage] Act." Thus, we do not find the issue of vesting determinative in ascertaining whether an interest in employee stock options constitutes marital property. *Rather, we conclude that an employee stock option constitutes property for purposes of dissolution proceedings only when the employee has an enforceable right to the options.*

In determining whether one has an enforceable right to employee stock options, a court must look to the terms of the contract granting such options. *If an employee has a presently enforceable right under the contract, regardless of whether the options are presently exercisable, such a right constitutes a property interest rather than a mere expectancy.*

*Id.* (citations omitted) (emphasis added).

We conclude that the granting of the 2001 options, while perhaps part of a regular and predictable pattern, was not mandated. In addition, we conclude that while service during 2000, or some portion of that year, may have been an eligibility requirement for the 2001 options, such service did not, without more, confer any enforceable property right. This eligibility requirement may have understandably led to the trial court's use of the word "acquired" and wife's use of the word "earned."

Our conclusion that there was no enforceable interest in the 2001 options prior to the grant is based on the 1997 stock option plan which stated that the committee "may" issue the stock options. As to the enforceable property right after the grant, absent the termination of her employment, there is no provision in the plan, the literature, or the grant which would have terminated wife's interest in the options.

Thus, in our opinion, wife had a mere expectancy and no enforceable property right in the 2001 options under either *Miller* or *Balanson* until February 27, 2001. We conclude that the 2001 stock options were marital property in their entirety.

We need not address the valuation of wife's stock options as the trial court used the reserved jurisdiction procedure as to husband's forty percent of wife's unexercised stock options. *See In re Marriage of Huston*, 967 P.2d 181, 183–84 (Colo.App.1998), *disapproved of in part by In re Marriage of Balanson*, 25 P.3d at 39. Further, at least as to the department store options, they had all vested prior to the hearing and have now expired.

Therefore, the property division must be vacated, and the case remanded to the trial court for further proceedings consistent with the views expressed in this opinion.

### III. Valuation of Wife's IRA

■ Relying on *In re Marriage of Burford*, 950 P.2d 682 (Colo.App.1997), husband argues the trial court erred in not adopting wife's expert's valuation of the marital portion of wife's premarital Individual Retirement Account (IRA). More particularly, he argues that the marital portion of the IRA should have been determined based on the increased value of individual securities in the IRA instead of the change in gross value, which, in effect, reduced the marital portion by the losses sustained with respect to other individual securities.

We are not persuaded that the valuation assigned to wife's IRA was an abuse of discretion or materially impacted the property division.

Section 14–10–113(1), in pertinent part, provides:

In a proceeding for dissolution of marriage ... the court ... shall set apart to each spouse his or her property and shall divide the marital property, without regard to marital misconduct, in such proportions as the court deems just after considering all relevant factors including:

...

(d) Any increases or decreases in the *value of the separate property* of the spouse

during the marriage or the depletion of the separate property for marital purposes.

(Emphasis added.)

Section 14–10–113(4), in pertinent part, provides:

[A]n *asset* of a spouse acquired prior to the marriage ... shall be considered as marital property, for purposes of this article only, to the extent that its present value exceeds its value at the time of the marriage or at the time of acquisition if acquired after the marriage.

(Emphasis added.)

In *Burford*, a division of this court held that although a spouse's "separate property," as used in section 14–10–113(2), consists of all of the separate assets owned, "an asset," as used in section 14–10–113(4), constitutes "only a single item," though the division defined neither term. The division stated:

Hence, in carrying out the division of the marital estate in accordance with § 14–10–113, the dissolution court should first add to the marital estate the amount of increase during the course of the marriage, if any, in each asset that was owned by each party before the marriage. For this purpose, any asset suffering a decrease in value should be disregarded. Section 14–10–113(4)[ ] requires that the increased value of each asset be added to the marital estate; the net overall increase or decrease in value of all of the spouse's separate property is not to be considered for this purpose.

*Burford*, 950 P.2d at 685.

Subsequently, in *In re Marriage of Seewald*, 22 P.3d 580 (Colo.App.2001), the husband placed his premarital assets into a trust prior to the marriage. The division held, following *Burford*, that, for the purposes of determining the divisible marital estate, any increase in the value of individual items of separate property must be determined pursuant to section 14–10–113(4), and then the overall value of a spouse's separate property, including increases and decreases in value of individual items, can be taken into account as an economic circumstance in distributing the marital estate pursuant to section 14–10–113(2)(d), C.R.S.2008.

Here, both husband and wife valued the marital portion of wife's IRA using the same method; that is, they subtracted the total value of the account at the commencement of the marriage from its total value at the end of the marriage. However, wife also called an expert witness who valued the marital portion of her IRA at $208,376, utilizing her interpretation of *Burford* and *Seewald*. According to the expert's report, wife transferred her IRA to a new brokerage during the marriage and substantially changed the investments at or near that time. The bulk of the account, at all times, was invested in mutual funds with respect to which the marital dividends were reinvested. Several investments were sold or transferred at a loss. At the time of the dissolution, the bulk of the IRA was invested in one family of funds which, through the reinvestment of marital dividends and increases in the value of shares, increased in value. It does not appear that wife contributed to her IRA during the marriage.

The trial court did not utilize the wife's expert's valuation, stating:

The Court finds that [wife's] and [husband's] pre-marital IRA and retirement accounts must be treated as one retirement asset and entity for each party pursuant to *In re Marriage of Burford*, 950 P.2d 682 (Colo.App.1997). Accordingly, the Court adopts [wife's] testimony regarding the separate and marital value of her IRA accounts.... The division of the marital portion of these assets is as set forth in the summary. The marital portion is awarded to [wife] but [husband] receives corresponding offsets. This saves attorney fees for the parties because it avoids any Qualified Domestic Relations Order from having to be drafted.

As we have already indicated, the trial court had discretion in dividing the marital estate, which division need not be mathematically precise. *See* § 14–10–113, C.R.S.2008; *In re Marriage of Gallo*, 752 P.2d 47, 55 (Colo.1988). In addition, the trial court has discretion in valuing assets. *In re Marriage of Page*, 70 P.3d 579, 582 (Colo.App.2003).

Husband's IRA account remained separate and suffered an overall loss. For that reason, husband argues its valuation is not subject to *Burford* and *Seewald*. His argument

ignores that marital dividends may have been reinvested and some individual investments may have increased in value.

The remaining investment and bank accounts containing separate assets were valued by both parties in the same manner as the trial court valued wife's IRA. Further, valuing wife's IRA in the manner husband suggests would increase the marital estate by only 6.6% and his distribution by 2.64% of the marital estate without the inclusion of the stock options.

Therefore, under the circumstances presented, we conclude that the trial court did not abuse its discretion in valuing and distributing the separate and marital portions of wife's IRA. *See In re Marriage of Balanson,* 25 P.3d at 43.

### IV. Other Property Division Issues

Because they might arise in the reconsideration of the property division on remand, we consider husband's other arguments regarding the property division.

#### A. Considerations in Dividing the Marital Estate

Husband argues that the trial court abused its discretion in not considering his contribution to the marital estate as a homemaker, the value of the separate property, and the parties' economic circumstances. We disagree.

A trial court must consider all relevant factors to achieve an equitable property distribution, including each spouse's contribution to the acquiring of marital property; the value of each spouse's separate property; the economic circumstances of each spouse; and any change in each spouse's separate property during the marriage or the depletion of separate property for marital purposes. *See* § 14–10–113(1).

However, the weighing of the factors listed in section 14–10–113(1) is within the sound discretion of the trial court. *In re Marriage of Casias,* 962 P.2d 999, 1003 (Colo.App. 1998). Because the court here stated that wife was to receive sixty percent of the marital estate based on the longevity of the marriage and the assets brought into the marriage by each party, we conclude the court weighed the factors listed in section 14–10–113(1) and found those two factors to be the most applicable.

█ Moreover, and contrary to husband's assertion, the court need not make specific findings as to each statutory factor as long as the findings made are sufficient to allow the reviewing court to determine that the decision is supported by competent evidence. *See In re Marriage of Finer,* 920 P.2d 325, 327 (Colo.App.1996). Because we can ascertain what factors the court found to be persuasive, its findings here are sufficient.

Neither *In re Marriage of Piper,* 820 P.2d 1198, 1201 (Colo.App.1991), nor *Casias,* 962 P.2d at 1002–03, cited by husband, compels a different conclusion because neither case requires the court to separately analyze, or state it considered, each statutory factor.

As the property division is remanded for reconsideration, the trial court can, however, be more explicit in this regard.

#### B. Division of Husband's Premarital Residence

█ Husband asserts that it was inequitable for the court to award wife sixty percent of his premarital home, which he conveyed into joint tenancy with wife following the marriage. We disagree.

█ The trial court has broad discretion in the division of property under section 14–10–113. If one spouse causes title to separate property to be placed in the joint names of both spouses, a gift is presumed, and the burden to show otherwise is upon the donor. *Finer,* 920 P.2d at 332; *In re Marriage of Moncrief,* 36 Colo.App. 140, 535 P.2d 1137 (1975).

Husband does not argue that a gift was not intended. To the extent husband is asserting the court made an inequitable property distribution or made inadequate findings, as discussed above, the trial court's findings and consideration of the statutory factors were adequate.

Here, the court found the home was marital property, a finding husband does not dispute and one that is amply supported by the record. Because the home was marital property, it is subject to an equitable distribution

with the rest of the marital estate, regardless of its origin as husband's separate property. *See* § 14–10–113(1).

### C.   Motor Vehicles

Husband contends that the court abused its discretion by including $14,000 of marital funds he spent on two motor vehicles in his share of the marital estate. We are not persuaded.

Although a court may consider whether one spouse dissipates marital assets in dividing property, *In re Marriage of Jorgenson,* 143 P.3d 1169, 1174 (Colo.App.2006), here the trial court did not do so and did not conclude that husband had dissipated marital assets. Apparently, it awarded husband the vehicles he had purchased with marital funds and valued them based on the marital funds expended in their purchase. However, because this issue is closely related to the valuation and distribution of other accounts and the use of funds the parties divided at separation for use during the dissolution proceedings, the trial court on remand should further review all of expenditures made from the funds set aside to each at separation to assure consistent treatment.

### D.   Valuation of Other Accounts

Husband contends that the court abused its discretion in valuing some of the parties' accounts. We agree that the challenged values should be revisited on remand.

### 1.

Husband first asserts that there is no evidence to support a value of $8,386 on World Savings Account 5185 awarded to wife. Wife's financial affidavit lists the balance of $19,687.73 and the most recent statement reflects $22,019. Wife testified that the bulk of the difference was expended for attorney fees and other litigation expenses. It appears that at separation, the parties agreed that each would take $130,000 of marital funds for personal expenses pending the dissolution proceedings from which attorney fees and expenses were expended by both. In addition, wife purchased furniture and husband purchased two motor vehicles. There was no detailed accounting for these funds by either party.

Husband asserts that because the trial court ordered the parties to each pay his or her own attorney fees and costs and made no similar adjustments with respect to the accounts allocated to him, it thereby, in effect, forced him to pay her attorney fees. Because the matter is remanded, the trial court should revisit this account to assure that the valuation and distribution is consistent with the treatment of other assets, together with the agreement and practice of the parties.

### 2.

Husband further argues that the trial court abused its discretion in valuing World Savings Accounts 0062 and 7069 by reducing their value based on tax liabilities for which he argues there is no support in the record and in awarding them at the reduced value to wife.

Wife argues that taking tax liabilities or consequences into account in valuing assets is appropriate under *In re Marriage of Bayer,* 687 P.2d 537 (Colo.App.1984). Wife's financial affidavit indicates that there may be a tax liability with respect to these accounts, she so testified, and her counsel included a deduction for tax liability in the closing argument. However, there appears to be no evidence in the record as to the amount of any tax liability or the tax rate, and no indication that other accounts similarly situated were similarly treated. Because the matter must be remanded in any event, the trial court should review all of the accounts and make appropriate further findings, conclusions, and adjustments, if any so as to treat them consistently.

### V.   Maintenance and Attorney Fees

Because we vacate the property division, the issues of maintenance and attorney fees must be reconsidered on remand. *See Balanson,* 25 P.3d at 43.

### VI.   Appellate Attorney Fees

Husband requests attorney fees under section 14–10–119, C.R.S.2008, and C.A.R. 39.5 for prosecuting this appeal. Without considering the appropriateness of attorney fees and costs, we entrust to the trial court "the determination of entitlement to or the

amount of any attorney fees" and costs to be awarded on remand. C.A.R. 39.5; *In re Marriage of Chalat*, 112 P.3d 47, 59 (Colo. 2005). In doing so, the trial court must consider the financial circumstances of the parties on remand.

The judgment is vacated, and the case is remanded for reconsideration of the property division, maintenance, and attorney fees consistent with views expressed in this opinion. In reconsidering these matters, the trial court must consider the financial circumstances of the parties on remand. *In re Marriage of Wells*, 850 P.2d 694, 697–98 (Colo.1993),

Judge TAUBMAN and Judge TERRY concur.