24CA1408 Marriage of Janousek 05-14-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA1408
Boulder County District Court No. 23DR30210
Honorable Andrew Hartman, Judge

In re the Marriage of

Michael Richard Janousek,

Appellee and Cross-Appellant,

and

Tamara Reynolds Janousek,

Appellant and Cross-Appellee.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE SCHUTZ
Freyre and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 14, 2026

Law Office of Joel M. Pratt, Joel M. Pratt, Colorado Springs, Colorado, for
Appellee and Cross-Appellant

Colorado Divorce Law Group, Brandi M. Petterson, Littleton, Colorado, for
Appellant and Cross-Appellee

¶ 1    This appeal arises from a dissolution of marriage action between Michael Richard Janousek and Tamara Reynolds Janousek.[1]  The district court entered permanent orders addressing the division of property, maintenance, and waste of the marital estate.  The parties contest different parts of the permanent orders in their appeal and cross-appeal.

¶ 2    We affirm the district court's judgment.

I.    Background

¶ 3    Michael and Tamara married in 1995.  They have three adult children.  The couple separated in 2021 and filed for divorce in May 2023.

¶ 4    At the initial status conference, Tamara requested emergency temporary orders, claiming that Michael had severely restricted her financial access to the marital estate.  The court denied her request for emergency relief but set a temporary orders hearing within a month.

¶ 5    The district court entered temporary orders in July 2023.  The following spring, after a three-day contested permanent orders

_____

[1] Because the parties share a last name, for clarity we refer to both by their first names.  We intend no disrespect by doing so.

1

hearing, the district court entered the permanent orders that are the subject of this appeal and cross-appeal.

## II.    Discussion

¶ 6      The parties' contentions on appeal are largely divided into three categories.  First, Tamara challenges the district court's ruling concerning their son's 529 account.  Second, both parties challenge the district court's calculation of Michael's income and the resulting maintenance award to Tamara.  Relatedly, Michael argues that the district court erred by requiring him to obtain life insurance as security for the maintenance award.  Finally, Tamara contends the district court erred by finding that she committed economic waste and allocating certain assets to Tamara, along with the associated debt.

¶ 7      We address these contentions in turn.

### A.    529 Account for Son's Education

#### 1.    Additional Facts

¶ 8      About a week before he filed for divorce, Michael placed $100,000 into a 529 account, for use in funding their son's education-related expenses.  Tamara testified that she did not know about the transfer of funds and would not have agreed to it.

¶ 9     Michael testified that he and Tamara had agreed to fund their children's college educations.  More specifically, Michael stated that he and Tamara agreed to pay for the children's living expenses in college, any expenses that weren't covered by the children's student loans, and one-half of the student loans used to pay tuition.  Michael was the sole guarantor of the children's student loans.  Michael also testified that the couple's middle daughter stopped paying on her student loan when he filed for divorce, requiring him to make the full loan payments.

¶ 10    Michael stated that he deposited $100,000 in the son's 529 account to ensure that the parties could comply with their past agreements regarding funding of their son's education.  Tamara objected to the transfer because it was made without her knowledge, and she believed Michael would retain access to the funds in the account.  Tamara also argued that their middle daughter's student loan debt was not part of the marital estate and instead was their daughter's obligation.

¶ 11    At the end of the permanent orders hearing, the district court found that the parties agreed to pay half of the children's loans as they accrued, but that Michael's $100,000 lump sum deposit in the

529 account was contrary to the parties' agreement. Still, it reasoned that it would be inequitable for Michael alone "to be saddled with that debt." In light of these findings, the district court ordered that only $50,000 of the $100,000 deposit would remain in the account for use to fund the parties' share of their son's education.

¶ 12    In addressing the remaining $50,000 in the account, the court first determined that the middle daughter had defaulted on her student loan. The balance of that loan was $35,369.77. The court found that even though the parties had agreed that the children would pay for half of their student loans, in practice, they had funded the portion of the children's share that the children either could not or did not pay. Given these historical practices, the court determined that $35,369.77 from the 529 account would be used to satisfy the balance of the middle daughter's student loan.[2] After paying the middle daughter's outstanding loan balance, the court

[2] Tamara's opening brief cites the district court's statements made at the conclusion of the permanent orders hearing, which vary slightly from the written orders it later entered. In resolving any inconsistencies, we treat the court's written orders as controlling. *See In re Marriage of Pawelec*, 2024 COA 107, ¶ 41 ("[I]n the event of a conflict, the written order prevails over the oral order.").

ordered the remaining balance of $14,630.23 to be equally divided between the parties.

¶ 13     Tamara now appeals the district court's determination that $50,000 of the money Michael deposited in their son's 529 account would remain in that account to fund the son's education and the court's distribution of the remaining funds.

## 2.     Standard of Review

¶ 14     Generally, we review a district court's division of the marital estate for an abuse of discretion. *In re Marriage of Powell*, 220 P.3d 952, 954 (Colo. App. 2009). We will not disturb the district court's factual findings unless they are clearly erroneous. *Id.* When dividing a marital estate, the "division must be equitable, but not necessarily equal." *In re Marriage of Wright*, 2020 COA 11, ¶ 3. An equitable division of the marital property is specific to the facts and circumstances of each case. *Id.*

¶ 15     To the extent that the court's property award is driven by statutory or other legal principles, we review its legal rulings de novo. *See In re Marriage of de Koning*, 2016 CO 2, ¶ 17. If the court's order is also based on factual findings, we evaluate those findings for clear error or an abuse of discretion. *Id.*

### 3. Analysis

¶ 16 Michael concedes that a court may not, absent an agreement of the parties, order the use of marital assets to fund an emancipated child's postsecondary education. *In re Marriage of Sewell*, 817 P.2d 594, 598 (Colo. App. 1991) ("[P]arents have neither an absolute duty to pay the post-secondary educational expenses of their minor children, nor an obligation to pay post-majority educational expenses." (citations omitted)); § 14-10-115(13)(a), C.R.S. 2025 ("[U]nless a court finds that a child is otherwise emancipated, emancipation occurs and child support terminates without either party filing a motion when the last or only child attains nineteen years of age [absent exceptions not applicable here].").

¶ 17 But Michael argues that the court may allocate marital funds to pay postsecondary expenses if doing so is consistent with the parties' prior agreement or practice to pay such expenses. *See Van Orman v. Van Orman*, 492 P.2d 81, 84 (Colo. App. 1971) ("[W]e do not agree with the wife's contention that, *even in the absence of a statutory or contractual duty to do so*, a divorced husband has an unqualified obligation and duty to pay for the college expenses of

6

his minor child . . . ."); *id.* at 85 (The court did not err by requiring that "father pay the sum of $1,100 to [son] as a contribution to college costs already incurred . . . [because] father concedes [the sum] was available for [son] from the funds of an irrevocable trust which the father had established for [son's] benefit.").

¶ 18 Tamara initially argues that the court should have treated the $100,000 deposit as marital dissipation or waste. We disagree.

¶ 19 The $100,000 was still in the 529 account at the time of final orders, and as explained more fully below, the court distributed $86,000 from the account for the benefit of the parties' son and middle daughter in satisfaction of the marital debt created by the parties' agreement and practice of paying significant portions of the children's college expenses. And the court allocated the remaining balance equally between Michael and Tamara.

¶ 20 The district court also addressed the timing of the deposit into the 529 account. Michael filed for divorce nine days after depositing the money. The district court acknowledged that making such a large transfer without the other party's consent so close to the filing date could potentially be problematic. However, the district court ultimately allocated the 529 funds in a manner

7

consistent with the parties' past agreements and practices to fund their children's higher education, with the remaining balance split evenly between the parties. Given the court's findings concerning the $100,000 deposited into the 529 account, we discern no error in its conclusion that the $100,000 deposit was not economic waste.

¶ 21    Next, Tamara contends the district court improperly allocated the funds to pay off their middle daughter's debt because Michael individually guaranteed that debt and Tamara did not. Thus, Tamara argues that she should have received half of the $50,000 that did not remain in the 529 account — that is, $25,000. We are unpersuaded.

¶ 22    Recall that in its written permanent orders the court allocated $35,369.77 of the withdrawn funds to pay off the balance of the parties' middle daughter's student loan debt and split the remaining $14,630.23 between the two parties. In explaining its decision to use a portion of the funds to pay off the middle daughter's loan balance, the court correctly determined that the middle daughter's student loan, which was incurred during the marriage, was marital debt subject to division between the parties, regardless of whether Michael alone served as the guarantor. *See In re Marriage of*

*Jorgenson*, 143 P.3d 1169, 1172 (Colo. App. 2006) (allocation of marital debts is in the nature of property division, and marital liabilities include all debts incurred by a husband or wife during their marriage); *see also* § 14-10-113(2), C.R.S. 2025 (subject to exceptions not relevant here, marital property is all property acquired by either spouse subsequent to the marriage). The court also reasoned that "although this allocation deviates from the parties' agreement with their [middle] daughter, the parties have not consistently required [her] to pay back her half of the loans, and, as the guarantor, [Michael] equitably should not be entirely responsible for the outstanding loan balance." We perceive no error in the court allocating $35,369.77 to pay a marital debt and then dividing the remaining $14,630.23 evenly between the parties.

¶ 23    Finally, as to the $50,000 remaining in the 529 account, the court designated this sum to pay that portion of their son's education that the parties had previously committed to pay. Focusing on the court's oral ruling that Michael's transfer of funds to the 529 account was not in accord with the parties' agreement regarding payment of the children's education expenses, Tamara argues that the court's order improperly forces her to pay for the

9

son's postsecondary education expenses in contravention of Colorado law.

¶ 24 Historically, the parties had taken private loans, deposited those funds in a 529 account, and then used the funds to pay their 50% share of their two daughters' educations. With respect to their son, who was a sophomore in college at the time of final orders, they made the same commitment to pay 50% of his education, but they did not obtain a private loan to fund that commitment. Instead, they periodically made deposits into the 529 account and then used those funds to pay their share of his education.

¶ 25 Thus, in allocating $50,000 of the 529 account for their son's education, the court was effectively treating this sum as a marital liability the parents owed to the son based on their past agreement and practices to fund such expenses. Under these circumstances, we cannot say that the district court abused its discretion by earmarking $50,000 to pay their share of their son's educational expenses. *See Van Orman*, 492 P.2d at 84-85.

¶ 26 Moreover, even if the district court erred by treating the parents' commitment to their son as a marital debt, the net result is that Tamara arguably should have received an additional $25,000.

Given that the total value of the parties' marital estate exceeded $2,500,000, we deem $25,000 to be de minimis and any error therefore harmless. *See In re Marriage of Balanson*, 25 P.3d 28, 36 (Colo. 2001) ("If . . . a trial court's error affects only a small percentage of the overall marital estate, such an error may be deemed to have been harmless and thus does not require reversal.").

### B. Maintenance Award

#### 1. Additional Facts

¶ 27    As part of its temporary orders, the district court required Michael to pay $10,000 per month to Tamara. Michael argued at the permanent orders hearing that his maintenance obligation should be reduced from the $10,000 temporary amount to $4,950 per month. Tamara argued for permanent maintenance in the amount of $12,636 for the duration of her lifetime, asserting that she was physically unable to work full time.

¶ 28    In its permanent orders, the district court ordered Michael to pay Tamara $8,000 per month until March 2038. The court based its maintenance determination on its finding that Michael earned a monthly income of $34,936, which it calculated as an average of

11

Michael's base salary and bonuses from 2019 to 2023. The court also found that Tamara was voluntarily underemployed and imputed her monthly income of $6,625.

¶ 29    The district court also required Michael to obtain a $1,000,000 life insurance policy, naming Tamara as the beneficiary, for the first five years of his maintenance obligation with a step-down of the policy's benefit for the remainder of the maintenance period.

## 2.    Parties' Contentions

¶ 30    Tamara contends that the district court abused its discretion by incorrectly calculating Michael's income. Specifically, Tamara argues that the court should have calculated Michael's income by using only his base salary from 2024 and then adding an average of Michael's bonuses from 2019-2023, rather than averaging both his base salary and bonuses over the prior five years.[3]

¶ 31    Michael cross-appeals the court's calculation of his income. While Michael agrees it was proper for the court to average his annual base salary between 2019 and 2023, he argues that the

---

[3]Tamara also argued in her briefs that the court should have included a dividend Michael received in calculating his salary. But during oral argument, Tamara's counsel stated that she is not pursuing this contention, so we do not address it further.

court abused its discretion by including his average bonuses over that same period. Michael notes that he testified he would almost certainly not receive a bonus in 2024, and that future bonuses were not guaranteed. Therefore, he argues that the court should not have included any bonuses in its calculation of his income. Michael also contends that the court failed to make the requisite findings under section 14-10-114(3)(c), C.R.S. 2025, to support its maintenance order.

¶ 32     Relatedly, Michael cross-appeals the court's order requiring him to obtain life insurance to secure his maintenance obligation. At times his opening brief appears to assert that Tamara failed to preserve any request for life insurance. At other times, he argues that Tamara failed to request an increase in the amount of life insurance beyond the existing $500,000 policy. In addition to his preservation contentions, Michael argues that the court failed to make the necessary findings to require him to obtain life insurance to secure the maintenance award.

¶ 33     We address the parties' contentions in turn.

13

### 3. Standard of Review

¶ 34 We review a district court's maintenance award for an abuse of discretion. *In re Marriage of Medeiros*, 2023 COA 42M, ¶ 58. And "we review de novo whether the district court correctly applied the law." *Id.* "The court has discretion to determine the award of maintenance that is fair and equitable to both parties based upon the totality of the circumstances." § 14-10-114(3)(e).

### 4. Analysis

#### a. Adequacy of Findings

¶ 35 Under section 14-10-114(3)(d), a court may only award maintenance "if it finds that the spouse seeking maintenance lacks sufficient property, including marital property apportioned to him or her, to provide for his or her reasonable needs and is unable to support himself or herself through appropriate employment." The court shall consider several factors under section 14-10-114(3)(c) to determine the amount and length of the award. Although the court must consider the statutory factors, it need not make express findings concerning each factor. *See Wright*, ¶ 20 ("[W]hile a district court has no obligation to make specific factual findings on every factor listed in section 14-10-114(3)(c), it must 'make sufficiently

14

explicit findings of fact to give the appellate court a clear understanding of the basis of its order.'" (quoting *In re Marriage of Gibbs*, 2019 COA 104, ¶ 9)).

¶ 36     We begin by addressing Michael's contention that the district court did not make adequate findings concerning the section 14-10-114(3)(c) factors. We are not persuaded. The court's permanent orders set forth these factors verbatim, and although the court did not make detailed findings concerning each factor, its lengthy discussion of the maintenance issues reflected its consideration of the statutory factors. Thus, we discern no error in the court's decision to award Tamara maintenance. *See Marriage of Wright,* ¶ 20.

b.     Michael's Income

¶ 37     We turn next to the court's calculation of Michael's income. When considering a maintenance award, the court must determine the parties' incomes. *In re Marriage of Tooker*, 2019 COA 83, ¶ 12; *see* § 14-10-114(3)(a)(I)(A). A party's gross income generally includes income from any source. *See* § 14-10-115(5)(a). "Bonuses . . . are to be included in a determination of income." *In re Marriage of Capparelli*, 2024 COA 103M, ¶ 32; *see* § 14-10-

115(5)(a)(I)(E). The court added an average of Michael's base salary and the bonuses he had received between 2019 and 2023 to determine that Michael's monthly income was $34,936.

¶ 38    We begin by addressing Tarama's argument that the district court abused its discretion by averaging Michael's base salary between 2019 and 2023 instead of using only his 2024 base salary. Despite this argument, Tamara contends that the court appropriately added his average annual bonuses over the prior five years to his base salary. Michael, by contrast, argues that the court properly relied on his average base salary over the last five years but improperly added his historical bonus income because he was not guaranteed to receive bonuses in 2024 or moving forward. We discern no error in the district court's calculation of Michael's income.

¶ 39    True, as Tamara notes, maintenance is typically based on the spouses' incomes at the time permanent orders enter. But the court recognized the uncertainty associated with Michael's 2024 income. On the one hand, he was receiving a base salary that was materially higher than his base salary over the prior five years, but

16

on the other hand, he had not yet received a bonus for 2024, and he stated that he did not think he would.

¶ 40     The district court recognized that the parties' respective arguments served their individual interests at the cost of an equitable result — Tamara by asking the court to maximize Michael's base salary by using his 2024 salary and then adding an average bonus, and Michael by asking the court to average his base salary over the last five years but not include any bonus, thereby minimizing his base salary and excluding bonuses to minimize his total income.

¶ 41     The court made clear that it found Michael's contention that he would not receive a bonus in 2024 to be unreliable.  Based on this factual determination, the court thoughtfully explained its decision to average Michael's bonuses and salary from 2019-2023. We cannot say that the court abused its discretion by resolving the uncertainty in Michael's 2024 income by using his average base salary and bonuses over the preceding five-year period.

c.     Life Insurance Policy

¶ 42     Next, we address Michael's arguments regarding the district court's order requiring Michael to obtain life insurance.  We begin

17

by addressing Michael's claim that Tamara failed to adequately preserve or support her request for life insurance to secure the maintenance award. We then turn to Michael's argument that the court failed to properly apply the provisions of section 14-10-114(6). We disagree with both arguments.

¶ 43    To the extent Michael argues that Tamara completely failed to preserve her life insurance request, the record establishes otherwise. In the parties' joint trial management certificate, Tamara affirmatively stated:

> [Tamara] additionally seeks life insurance to secure [Michael's] maintenance obligation. [Tamara] notes that, just days before filing the Petition for Dissolution, [Michael] removed [Tamara] as a beneficiary on his life insurance policy, giving 100% of the policy to the parties' adult son as the primary beneficiary. [Michael] must be required to provide proof that the policy is in place and that premiums have been paid each year.

¶ 44    Moreover, during her direct examination, Tamara testified about Michael's existing $500,000 policy and stated, "I need to have guarantee that maintenance will be paid out. So I would request that life insurance be carried on him . . . ." Thus, Tamara clearly

preserved this issue. *See In re Estate of Owens*, 2017 COA 53, ¶ 21 ("[N]o talismanic language is required to preserve an issue.").

¶ 45    Michael also argues on appeal that Tamara failed to preserve a claim that she would ask for a life insurance policy in excess of the existing $500,000 policy. We reject this argument for multiple reasons. First, as noted in the joint trial management certificate, Michael had changed the beneficiary under the existing policy. Michael does not dispute this fact. Thus, at the time of final orders there was no existing life insurance policy naming Tamara as the beneficiary. Moreover, as Tamara notes, it would have been inappropriate for her to request a specific amount of insurance because it could not be known until the court first established the amount and term of maintenance. In any event, Michael had previously been insured for $500,000, and the parties knew the range of maintenance they were each seeking. Under these circumstances, we conclude that Michael was on notice that Tamara was requesting a life insurance policy to secure the maintenance award and that the face value of the policy would likely be near $1,000,000.

¶ 46    Next, Michael points out that section 14-10-114(6) requires the court to make certain findings before imposing a life insurance requirement. Specifically, the statute provides:

> (a) The court may require the payor spouse to provide reasonable security for the payment of maintenance in the event of the payor spouse's death prior to the end of the maintenance term.
>
> (b) Reasonable security may include, but need not be limited to, maintenance of life insurance for the benefit of the recipient spouse. In entering an order to maintain life insurance, the court shall consider:
>
> (I) The age and insurability of the payor spouse;
>
> (II) The cost of the life insurance;
>
> (III) The amount and term of the maintenance;
>
> (IV) Whether the parties carried life insurance during the marriage;
>
> (V) Prevailing interest rates at the time of the order; and
>
> (VI) Other obligations of the payor spouse.

§ 14-10-114(6).

¶ 47    As Michael notes, the statute requires the court to consider these enumerated factors before compelling a spouse to provide security for a maintenance award. But neither the statute nor our

case law requires that the court make express findings on each of the enumerated factors. *Cf. Wright*, ¶ 20.

¶ 48    Although it did not make express findings on each of the statutory factors, the court's order reflects its adequate consideration of them in making its award. The court was aware of Michael's age and the fact that he was previously insured for Tamara's benefit in the amount of $500,000. No party presented evidence suggesting that he was uninsurable or that the policy premiums were cost prohibitive.

¶ 49    True, the court did not expressly consider how the monthly premiums would impact Michael's ability to pay maintenance. But the court expressly recited this statutory consideration, so it was mindful of it. And Michael presented no evidence below, or any argument on appeal, that his existing income was not adequate to pay both maintenance and the life insurance premiums.

¶ 50    Moreover, the district court carefully made the policy's benefit commensurate with the maintenance award and its duration. The award of $8,000 per month over the thirteen-year maintenance term resulted in a total maintenance obligation of approximately $1,250,000. Thus, the court selected a rational policy amount of

$1,000,000. But the court also recognized that the total maintenance obligation would decrease over time. It therefore ordered a reduction in the policy amount to $750,000 for years six through ten of the maintenance obligation and to $500,000 for the final three years.

¶ 51     These findings reflect the district court's thoughtful consideration of the statutory factors, are supported by the record, and fall within the district court's discretion. We perceive no abuse of discretion in the district court's orders regarding life insurance.

C.     Economic Waste and Personal Property Allocations

¶ 52     Next, Tamara appeals the district court's determination that she committed economic waste in her failure to lease the couple's Moab rental property. She also argues that the district court erred by finding waste regarding her spending habits. Part of her argument is based on a false premise. While the court did find that Tamara's failure to lease the parties' vacation home between temporary and permanent orders constituted waste, the court did not find that her expenditures on personal property or the money transfer to family members constituted economic waste. Rather,

the court simply attributed the associated personal property and funds to Tamara.

¶ 53    We turn now to Tamara's contentions regarding these issues.

### 1.    Additional Facts

¶ 54    Michael and Tamara shared a large income and lived a lifestyle commensurate with that income. Both parties appeared to maintain that lifestyle while their divorce was pending.

¶ 55    The parties lived separately for about eighteen months before they formally divorced. In that time, Tamara bought new furniture, which the district court determined had a value of $36,651. During the divorce proceedings, Tamara also bought quite a bit of clothing. The district court ultimately determined Tamara should be awarded that clothing and that its value equaled $21,300. Tamara also moved money out of the marital estate and gave it to other people, including $21,000 to her sister. The court received conflicting testimony whether some or all of these transfers were a loan or gift. Tamara also deposited roughly $2,600 of her earnings from a part-time sales job into her middle daughter's account. Michael testified that he was not aware of the gift or loan to Tamara's sister or of

Tamara's deposit of her income into the daughter's account. The court found all these funds were marital property.

¶ 56 During the marriage, Michael acquired a large sports memorabilia collection with a marital value of approximately $105,259. He also continued to make memorabilia purchases and spent significant amounts on sporting events while the divorce was pending. The court treated the sports memorabilia as marital property.

¶ 57 Michael and Tamara also owned a condo in Moab, which they typically leased. Tamara managed the rental property. In its temporary orders, the court ordered the parties to lease the property to generate income, but Tamara failed to do so.

¶ 58 By the time the court entered permanent orders, the condo was under contract for sale and was scheduled to close within a few days. Michael requested that the lost income resulting from the property sitting vacant be attributed to Tamara. Tamara argued that not renting the condo was a reasonable decision because it would have made it more difficult to sell. During this time, Tamara also insisted on a listing price for the property that appeared to be too high for the market. As a result, the house remained vacant

and on the market for several months. Based on these facts, the district court concluded that Tamara caused $34,058.64 of waste by not leasing the property during the pendency of these proceedings.

## 2. Standard of Review

¶ 59 Section 14-10-107(4)(b)(I), C.R.S. 2025, imposes a "temporary injunction" against both parties that remains in effect "until the final decree is entered or the petition is dismissed." The statute reads in relevant part:

> [B]oth parties [are restrained] from transferring, encumbering, concealing, or in any way disposing of, without the consent of the other party or an order of the court, any marital property, except in the usual course of business or for the necessities of life and . . . each party [is required] to notify the other party of any proposed extraordinary expenditures and to account to the court for all extraordinary expenditures made after the injunction is in effect.

§ 14-10-107(4)(b)(I)(A).

¶ 60 As previously stated, we do not disturb the division of a marital estate unless the district court has abused its discretion. *Powell*, 220 P.3d at 954. Whether a party has dissipated marital funds presents a question of fact, and we uphold the district court's

25

findings unless there is no record support for them. *See Van Gundy v. Van Gundy*, 2012 COA 194, ¶ 12 ("A court's factual findings are clearly erroneous only if there is no support for them in the record.").

### 3. Economic Waste of Moab Property

¶ 61 Tamara testified that she took over the management of the Moab property in late 2022. She talked about repairs the property needed before it was ready to be placed on the market, including fire inspections, and said she was temporarily wheelchair-bound after an accident during this period. Tamara also testified that she thought the property would be difficult to sell while it was occupied by renters. Michael testified that Tamara refused to rent the property. He also presented evidence that the total loss during the eight months between temporary and permanent orders was $34,058.64. It is undisputed that the property sat vacant for eight months after Michael filed the petition for divorce.

¶ 62 The district court found that Tamara had committed waste by not renting the property. In addressing Tamara's proffered explanations, the court found her "justification for not seeking rental of the property is just nonsensical. It had a rental history. It

was a monthly burn, which even if there is some tax benefits, it's still a loss. And if that could have been rented, that would have been a marital asset." The district court also credited Michael's testimony concerning the amount of the lost income.

¶ 63 Thus, because the district court's findings are supported by the record, we defer to them and conclude that it did not err by determining that Tamara's refusal to lease the Moab property resulted in $34,058.64 of economic waste. *See Jorgenson*, 143 P.3d at 1174 (noting that the district court could assign husband sole responsibility for a lease liability because husband's decision to stop making lease payments constituted economic fault).

### 4. Tamara's Spending

¶ 64 As previously noted, Tamara argues that the district court found her spending on personal property to be waste as well. But that argument misapprehends the record. The court did not conclude that her spending constituted economic waste, but rather that the marital debt and associated marital property obtained through that spending should be allocated to her.

¶ 65 Tamara argues that because she bought the clothing and furniture on a credit card and was also allocated the debt of that

credit card, she was forced to pay for the clothing and furniture twice. But, as Michael points out, it is not unusual for a court to allocate personal property as an asset and the associated debt to a particular party. Doing so allows that party to realize the net value of the asset. We discern no error in the court's doing so here.

¶ 66 Tamara also argues that the amount she spent on clothing after temporary orders was in line with what she spent during the marriage. However, evidence admitted during the permanent orders hearing showed that her clothing spending dramatically increased after the court entered its temporary orders. While she spent $3,235 between January 1 and July 10, 2023, the court received evidence that she spent $17,866 between July 11 and December 31, 2023.

¶ 67 Tamara also asserts that the district court inverted numbers in calculating her clothing expenditures. She points to an exhibit in which some of her expenditures on clothing were quantified at $12,300. But the court did not cite that exhibit when referring to the clothing awarded to Tamara. And the court also received evidence from Michael that her clothing expenditures between temporary and final orders were proximate to the amount the court

awarded to Tamara.  Under these circumstances, we cannot conclude that the district court abused its discretion in setting the value of the clothing assigned to Tamara at $21,300 and allocating that clothing and the associated debt to her.

¶ 68    Finally, even if we were to accept Tamara's premise that the court transposed the numbers representing her spending on clothing, the difference between the number she cites and the court's figure is less than $9,000.  Given the size of this estate, that asserted error is de minimis.  *See Balanson*, 25 P.3d at 36.

5.    Tamara's Transfers to her Sister and Daughter

¶ 69    Turning to Tamara's transfer of money to family members, the evidence was in conflict whether the money she gave to her sister was a gift or a loan.  The parties had previously made monetary gifts to Tamara's sister during the marriage.  After the parties separated but before the petition was filed, Tamara gave her sister various sums that collectively exceeded $21,000.  Tamara also diverted approximately $2,600 into her middle daughter's bank account.  Michael testified that Tamara made these money transfers without his knowledge.

¶ 70     The district court found that the funds were marital property that Tamara diverted without Michael's agreement. Accordingly, the court attributed the combined amount to Tamara. With respect the money transferred to Tamara's sister, the court stated that she was entitled to collect the money from her sister, if it was indeed a loan. In reaching these conclusions, the court found that Tamara "was not highly credible on financial matters, . . . was evasive and rambling, provided unsupported contradictory testimony, and often relied on inaccurate filings and disclosures." By contrast, the court seems to have found Michael's testimony credible.

¶ 71     We discern no error in the court's finding that these transfers, and any corresponding right to repayment, should be attributed to Tamara. *See Lawry v. Palm*, 192 P.3d 550, 558 (Colo. App. 2008) ("We defer to the court's credibility determinations and will disturb its findings of fact only if they are clearly erroneous and not supported by the record.").

### 6.     Michael's Spending

¶ 72     Tamara argues that, if the district court properly determined that some of her spending on clothing and furniture was waste, then it erred by not determining that Michael's spending was also

waste. But this argument is also based on the noted false premise. The court did not treat either Tamara's expenditures on clothing or her transfers to family members as economic waste. Therefore, we do not further analyze her comparative spending argument, though we note that the court allocated the sports memorabilia to Michael as a marital asset, just as it allocated the clothing and furniture to Tamara as a marital asset.

## D. Attorney Fees and Costs

¶ 73 Finally, Tamara requests an award of her attorney fees and costs incurred on appeal under C.A.R. 38(b), 39(a), and 39.1 and section 14-10-119, C.R.S. 2025.

¶ 74 C.A.R. 38(b) addresses an appellate court's authority to award attorney fees as sanctions against a party for a "frivolous appeal." Tamara does not develop any argument explaining why Michael's defense of Tamara's appeal or his own cross-appeal was frivolous, so we do not address it further. *See Woodbridge Condo. Ass'n v. Lo Viento Blanco, LLC*, 2020 COA 34, ¶ 41 n.12 ("We don't consider undeveloped and unsupported arguments."), *aff'd*, 2021 CO 56.

¶ 75 Tamara is correct that under section 14-10-119 an appellate court, "after considering the financial resources of both parties" can

order one party to pay the fees and costs of the other party. § 14-10-119. The purpose of section 14-10-119 is to ensure that "neither party suffers undue economic hardship as a result of the proceedings." *In re Marriage of Aldrich*, 945 P.2d 1370, 1377 (Colo. 1997). And Tamara is correct that Michael makes significantly more money than she does. However, in rejecting Tamara's request for attorney fees, the district court concluded that both parties have ample resources to pay for their own attorney fees and costs. Neither party points to any material developments that would impact this conclusion. Therefore, we exercise our discretion under C.A.R. 39.1 and deny Tamara's request for attorney fees

¶ 76    Rule 39(a)(2) provides that if a judgment is affirmed on appeal, the appellant is entitled to an award of costs "unless the law provides or the court orders otherwise." This case involves both an appeal and a cross-appeal, and neither party prevailed on their respective appeals. Under the circumstances, we conclude that neither party is entitled to an award of appellate costs.

### III.   Disposition

¶ 77    The district court's judgment is affirmed.

JUDGE FREYRE and JUDGE BROWN concur.